Filed 12/17/14  P. v. Barnett CA2/7
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B241357 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA370481) |
| v. | |
| TIMOTHY BARNETT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Reversed and remanded for a new trial.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Timothy Barnett appeals from the judgment entered following his conviction by a jury on multiple counts related to fraudulent purchases of home equity from homeowners in default on loans secured by their property. Barnett contends the trial court violated his constitutional rights by denying his request for appointed counsel to replace the retained lawyer he could no longer pay and who, as a result, had failed to devote time to trial preparation.[1] We agree and reverse the judgment because the deprivation of his right to counsel constituted structural error. (See *People v. Ortiz* (1990) 51 Cal.3d 975, 988.)

Although we reverse for procedural error, we also address Barnett's contention his convictions were not supported by sufficient evidence to determine whether he may be retried on those charges. (See *People v. Morgan* (2007) 42 Cal.4th 593, 613; *People v. Hayes* (1990) 52 Cal.3d 577, 631.) We conclude substantial evidence supported his convictions and there is no barrier to his retrial.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Alleged Crimes*

Barnett was charged by information on June 28, 2010 with five counts of illegal purchase of equity in real property in violation of the Home Equity Sales Contract Act (Civ. Code, § 1695.8) (HESCA),[2] five counts of theft of real property (Pen. Code, § 487,

---

[1]  Barnett has also filed a companion petition for habeas corpus relief asserting he received ineffective assistance of counsel.

[2]  HESCA was adopted in 1979 to protect homeowners whose residences were in foreclosure from unfair dealings with investors seeking to purchase their properties; it was intended to ensure a homeowner has adequate information to make informed decisions and imposes a number of requirements to protect the homeowner. (See Civ. Code, §§ 1695.2-1695.6; *Spencer v. Marshall* (2008) 168 Cal.App.4th 783, 794.) Civil Code section 1695.8 criminalizes violations of HESCA involving fraud or deceit: "Any equity purchaser who violates any subdivision of Section 1695.6 or who engages in any practice which would operate as a fraud or deceit upon an equity seller shall, upon conviction, be punished by a fine of not more than twenty-five thousand dollars ($25,000), by imprisonment in the county jail for not more than one year, . . . or by both that fine and imprisonment for each violation." (See *People v. Shetty* (2009) 174 Cal.App.4th 1488, 1491.) A violation of Civil Code section 1695.8 is punishable as either a felony or a misdemeanor. (Pen. Code, § 17, subd. (b); see *People v. Park* (2013) 56 Cal.4th 782, 789.)

subd. (a)),[3] six counts of procuring and offering false documents for recording (§ 115, subd. (a)), two counts of theft from an elderly person (§ 368, subd. (d)), two counts of forgery (§ 470, subd. (d)), one count of identity theft (§ 530.5, subd. (a)), and two counts of first degree residential burglary (§ 459). The information specially alleged the crimes were related felonies involving the taking of more than $500,000 (§ 186.11, subd. (a)) and Barnett had suffered two prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Barnett pleaded not guilty and denied the special allegations.

      2. *Barnett's Attempt To Obtain Appointed Counsel Prior to Trial*

Barnett was represented by private attorney Winston McKesson from the time of his arrest in April 2010 through June 2011 when McKesson was replaced by Amy Konstantelos. In mid-November 2011 Barnett wrote two letters to the trial court expressing his concern about his "lack of defense representation." He told the court he had no money to pay Konstantelos and was worried she did not have time to meet with him to discuss the case. Konstantelos had told him that without financial resources she could not represent him effectively.[4] Barnett said he had asked both of his retained attorneys if a "state-appointed attorney" would be better for all concerned, but they had recommended against it. He emphasized he did not want to delay his trial but explained in the five months he had been represented by Konstantelos he had yet to speak with her about the case or receive any documents related to his case. Based on her lack of preparation and the possibility he would spend the rest of his life in prison, he believed he needed appointed counsel and asked the court to assign one.

The court considered Barnett's request at the December 1, 2011 pretrial conference, which had been scheduled before Barnett wrote his letters. The court stated it had not read the letters but understood there was a dispute about Konstantelos's compensation. Konstantelos told the court Barnett was afraid she had not spent "his

---

[3]     Statutory references are to the Penal Code unless otherwise indicated.

[4]     Barnett stated he had paid McKesson approximately $25,000 before McKesson withdrew. Barnett had paid $2,500 to Konstantelos.

3

allotted time" with him because she was not being paid (the cost of the case "is coming out of my own pocket") and that she had been forced to take on other matters to keep her practice afloat. She stated, however, she understood her responsibility and thought she could still be ready for trial. Barnett interrupted Konstantelos to say he did not want her to feel obligated when she was not being paid but added, "I'm in custody. I don't have the wherewithal to pay her. . . . Based on her emails, there's no communication with her and I. And with all due respect, since June we have not discussed my case. So we're now in December. . . . They're trying to give me life. I'm looking for an attorney that's going to represent me, that's going to listen to what I have to say."

After expressing concern a change of attorney would result in a delay of the trial date—which had not yet been set—and hardship for the elderly witnesses, the court asked whether Barnett wanted to discharge his counsel. Barnett answered by referring the court to the letters he had written. The court interjected, "I don't usually read ex parte communications from defendants unless there's some absolute reason I should. You're represented by counsel. I'm not necessarily supposed to communicate with you." Barnett continued, "What I'm requesting, your honor, is . . . if I can get a state appointed attorney to represent me. In the letter I indicated I'm not asking for a delay, but what I am asking for is representation because I'm fighting for my life."

The court asked the prosecutor for a response; the prosecutor asked, if there were to be a delay, the trial be set "within the 70 days or shortly thereafter." The court then observed, "The other thing that came to mind—but I think it's dramatically frowned upon; I don't think I should do it—is to appoint the lawyer who takes the case privately and then have her appointed as a public lawyer. . . . It's rewarding a lawyer for taking a case that they haven't worked out the financial arrangements and then turning around and then putting them on the public payroll. . . . I'm also just a tiny bit upset at you, counsel . . . . You didn't let me know there was this problem way before 70 days . . . ." Konstantelos answered, "I did call over a month ago and spoke to the clerk . . . . I said could you let the judge know, and if I need to come early before today, we can schedule a court date." When the court questioned Konstantelos's failure to raise the issue earlier by

4

motion, she responded she was not asking to be relieved because she believed she was responsible for the case. The court then stated, "That basically ends the story, then. If he's not . . . discharging you, and you're not asking to be relieved[, . . .] [t]here's nothing else I can really do in this. You are the lawyer." To allow time to research the question, the court set a follow-up hearing for the following week.

On December 9, 2011 the court reconvened the hearing and announced there was no ground to appoint Konstantelos as *Harris* counsel.[5] The court also stated it had decided there were no grounds to remove Konstantelos on economic grounds, concluding, "She's going to be the counsel of record." The court asked counsel if the trial could begin on February 8, 2012 but realized that date would push the trial to the end of the 70-day limitation. The court asked Barnett if he would waive his right to a speedy trial, and Barnett agreed. The trial was set for February 8, 2012 and began on February 17, 2012.

3. *The Evidence at Trial*[6]

The charges against Barnett arose from five transactions the People contend were part of an "equity-stripping scheme" in which Barnett identified homeowners who had positive equity in their homes but had fallen into default on loan obligations secured by deeds of trust on those homes, convinced those homeowners to enter into equity purchase transactions with his company and then siphoned the remaining equity from the homes by selling them to third-party strawmen. Although Barnett consistently promised the homeowners they would be able to remain in their homes with an option to purchase the home after improving their credit, the homeowners found their homes had been sold and heavily burdened with additional debt beyond their ability to carry.

---

[5] In *Harris v. Superior Court* (1977) 19 Cal.3d 786 the Supreme Court "held that a trial court's discretion in appointing counsel for an indigent defendant when the public defender declares a conflict is not constrained by the defendant's preference for a particular attorney." (*People v. Lancaster* (2007) 41 Cal.4th 50, 70, fn. 5.) *Harris* did not address "the appointment of private counsel when the public defender is available to represent the defendant." (*Lancaster,* at p. 71, fn. 6.)

[6] The evidence at trial was introduced by the People. Barnett did not testify or present any witnesses.

5

Barnett owned a real estate loan brokerage company known as Trusperity Acquisition Corporation that also operated at times under the names Buyers Market Realty Services (BMRS) and Dealpoint Investments.  In 2005 Trusperity began processing home equity sales transactions.  Barnett oversaw those transactions and trained his staff to identify homeowners in default on secured loans who might be interested in a home equity sales contract.  As his employees testified, Barnett, who is African-American, referred to Hispanics and African-Americans as "his people" and instructed the employees to focus on the Hispanic and Black populations in South Los Angeles and Compton because "they don't sue, and they don't ask a lot of questions . . . ."  Although Trusperity used templates approved by an attorney for these transactions, when customers came into the office to sign the printed forms, they rarely read what they were signing.

The five contracts at issue in this case include:

a. *The Baker transaction*

Eddie Baker bought his South Los Angeles home in 1969.  In 2004 he borrowed $206,000, an amount secured by a deed of trust on the property.  By June 2005 he had fallen behind in his payments, and the company holding the deed of trust filed a notice of default indicating an outstanding balance of $7,467.09.  Barnett appeared at his house and told Baker he could help Baker pay his arrears and repair his credit.  After several meetings Baker signed an equity purchase agreement providing Barnett would purchase Baker's home for $226,000, subject to the existing loan, and pay Baker $12,000.  On July 6, 2005 Baker also signed a grant deed transferring title to Barnett and a lease indicating he would pay a monthly rent of $1,000 to Barnett for the next three years.  The lease contained an option clause, guaranteeing Baker the right to buy back the house for $251,000 at any time during the second year of the lease term.  If he failed to exercise the option, however, it would terminate.  Baker later testified he did not understand he had sold his house to Barnett and did not read all the papers because he trusted Barnett, who seemed professional, treated Baker well and was a Christian.

Barnett also had Baker sign escrow instructions reflecting a sale price of $440,000, to be funded by a loan of $352,000.  An amendment to the escrow instructions directed

the escrow company to wire the proceeds from the sale to BMRS. In mid-July 2005 this escrow was cancelled and re-opened with new instructions indicating a sale price of $218,852.47 (the amount owed on Baker's existing secured loan). Trusperity deposited funds to cover the costs specified in the new escrow instructions. Barnett then opened a third escrow account. On July 18, 2005 Barnett transferred Baker's home to Trusperity; the deed was recorded three days later. That same day Trusperity (acting through its president, Barnett's wife Kimberly) obtained a loan from Anchor Mortgage (Anchor) for $285,000 secured by a trust deed recorded against the house. After paying off Baker's existing loan, as well as escrow and title fees, Trusperity received $45,139.92 from the loan proceeds.

In September 2005 Trusperity entered into an agreement to sell the home to Derry Hood for $440,000. An escrow account was opened for the transaction with a different company. The escrow instructions indicated the purchase price would be funded by a $352,000 loan secured by a first deed of trust and an additional loan of $66,000 secured by a second deed of trust. Barnett deposited $27,000 into escrow for the benefit of Hood. When the escrow closed and the loans were funded, the Anchor loan of $285,000 was paid off. After deducting closing costs, the escrow company wired Barnett the balance of $136,975.94.

After the sale to Hood, Baker began receiving mail at his house addressed to Hood. Baker called Barnett and asked him about the letters. Barnett told Baker not to worry and that he would take care of it. Barnett also told Baker Hood was a former employee. When Hood appeared at Baker's home and told Baker he owned it, Baker sought legal assistance.

b. *The Iverson transaction*

Billie Mae Iverson bought her Compton home in 1967. In 1988 she borrowed $88,000 from Aames Home Loan secured by a trust deed recorded against the property. In 1997 she borrowed $25,000 from Wells Fargo similarly secured by a trust deed recorded against the property. Iverson's husband died in 2002, and by 2005 she was

7

behind on her payments to Wells Fargo. On September 14, 2005 a notice of default was recorded against the property indicating an outstanding balance of $2,283.31.

On September 15, 2005 a man in his late 20's came to Iverson's home and said he understood she was having financial problems with her house. He told Iverson he had a brother in real estate who had helped many other people in the area. Barnett showed up at the house an hour later. Iverson told Barnett she only wanted a reverse mortgage, and Barnett replied he had a better program. Barnett explained the program, but Iverson testified at trial she did not understand any of the details. Iverson repeatedly told Barnett she did not want to sell her home, and Barnett assured her she would not lose her home. Iverson believed she would receive monthly income from her equity until her death. She signed multiple documents while Barnett was at her home, later saying Barnett earned her trust by saying he was a Christian and professing his desire to help people. Iverson, Barnett said, reminded him of his mother.

One of the documents Iverson signed was an equity purchase agreement providing Barnett would purchase the home for $104,000, subject to the existing first and second trust deeds. She also signed a lease under which Barnett became her landlord. The lease contained an option provision, granting Iverson the right to buy the property back for $100,000 during the second year of the lease. Iverson also signed a consent for Barnett to sell or encumber the house during the lease period.

An escrow account for the transaction was opened, and Iverson signed instructions providing Barnett would purchase the home for $250,000 and finance the sale with a loan subject to a deed of trust. Barnett obtained a loan from Anchor. On September 16, 2005 Iverson signed a grant deed transferring the property to Barnett, which he recorded. Iverson also signed a consent for the escrow company to disburse the proceeds from the sale of her home to Barnett with the exception of $6,000 to be paid directly to Iverson. After the escrow closed and the original trust deed holders had been paid, the escrow company disbursed $6,000 to Iverson and $139,064.03 to Barnett.

In January 2006 an escrow account was opened with a different escrow company for the sale of the property from Barnett to Robbie Odom for $400,000. Funding in the

8

amount of $378,793.50 was obtained from Silver State Financial, which was used to pay the existing Anchor secured loan of $271,411.26. After deducting closing costs, the escrow company disbursed $112,112.85 to Barnett and $284.78 to Odom. On January 23, 2006 Barnett signed a grant deed transferring the property to Odom. The deed was recorded on March 10, 2006.

After the sale, mail addressed to Odom was delivered to Iverson's house. Iverson called Barnett, who told her Odom was a business associate. On August 21, 2007 a notice of default indicating Odom was delinquent on his loan was recorded against the house. On November 28, 2007 a notice of trustee's sale was recorded. Iverson sought legal assistance, and a lawsuit was filed on her behalf. As a result Odom quit-claimed the property, now encumbered by the Silver State Financial loan, to Iverson.

### c. *The Hitchens transaction*

Tohnnie Ray Hitchens and his elderly mother, Ruby Lee Harris, purchased their home in South Los Angeles with a $65,000 loan from Wells Fargo. In 2005 Hitchens's income decreased, and he fell behind on payments. On October 7, 2005 a notice of default was recorded against their home indicating a delinquency of $4,750.12. Several days later Hitchens arrived home to find his mother missing. Soon Barnett drove up to the home with Harris in the car. Barnett introduced himself, saying he understood their property was in default and he was there to help them. Harris had documents in her possession Barnett had given her. As Hitchens testified, Barnett offered to purchase the property for something around $63,000. Hitchens owed $65,000 on the house and did not want to sell. Barnett told Hitchens he would have to make a quick decision and left.

Hitchens met with Barnett and explained he wanted to save his home, not sell it. Barnett agreed to help Hitchens refinance the house and pay off the existing loan. Hitchens signed multiple documents provided by Barnett, still believing he was refinancing his home. Hitchens trusted him because Barnett was a Christian, African-American, as he was, and had stressed his ethical values.

Escrow instructions created for the transaction indicated Hitchens would obtain a loan for $90,000. Hitchens signed a note secured by a deed of trust on the property

9

stating he had borrowed $15,000 from BMRS and would repay it by November 21, 2005. He also signed a deed of trust securing the loan with his house. At Barnett's direction, Harris signed a deed transferring her interest in the home to her son to facilitate the search for a loan.

Several months later Barnett informed Hitchens he had been unable to find a lender because Hitchens did not qualify for new financing. Barnett suggested instead he purchase the home from Hitchens, qualify himself for a secured loan and then reconvey the home to Hitchens in 45 days. Barnett told Hitchens this was a customary real estate procedure. Hitchens agreed. New escrow instructions were prepared stating Hitchens would sell his house to Barnett for $230,000. On February 13, 2006 Hitchens signed a grant deed transferring the property to Barnett. Anchor agreed to fund the transaction through a hard money loan with a one-year term. Hitchens was unaware of these terms.

On February 15, 2006 the sale closed. After the original Wells Fargo loan was repaid, $15,000 was also paid to BMRS. After closing costs were deducted, $7,000 was disbursed to Hitchens, and $131,202.47 was disbursed to Barnett. Despite his promise to reconvey the property to Hitchens, Barnett failed to do so. Hitchens sought legal assistance when Barnett did not respond to him and eventually won his house back. However, he was unable to pay off the Anchor debt, was forced into foreclosure, and the house was sold.

### d. *The King transaction*

Dorothy King bought her South Los Angeles home in 1964. While suffering from dementia in 2004, she obtained several loans, including one for $235,000, secured by trust deeds on the property. On December 5, 2005 a notice of default was recorded stating King was delinquent on one of those loans in the amount of $8,103.11. On December 7, 2005 King, who also suffered from cataracts and could not read the documents provided to her by Barnett, signed an equity purchase agreement to sell her home to him for $288,500. She also signed a disclosure form indicating she understood she had equity in the home in excess of the purchase price but that the offer was best suited to her needs and goals.

10

An escrow account was opened to process the sale at a price of $300,000. Amendments to the instructions indicated King would pay all closing costs and that all proceeds were to be wired to Barnett. On December 31, 2005 Barnett borrowed $301,000 from Anchor, again in the form of a hard money loan with a balloon payment at the end of a year. King signed a deed transferring the property to Barnett and a lease with a term of three years and a monthly rent of $1,000. The lease gave King the right to repurchase the home during the second year of the lease term for $396,000. After closing, including repayment of the 2004 loans, the escrow company distributed the balance of $34,186 to Barnett.

In January 2006 another escrow account was opened to process sale of the home to Odom at a price of $427,600, funded by loans of $360,000 and $67,500. The sale price was subsequently adjusted to $450,000, and Odom deposited $27,296 to make up the difference. On January 24, 2006 Barnett signed a deed transferring King's home to Odom. On March 1, 2006 Odom borrowed $315,000 secured by a first deed of trust and an additional $112,500 secured by a second deed of trust. After closing, Barnett netted $119,310.80 from the sale.

By December 2006 the property was in foreclosure. King's niece, Angenetta Allen, a real estate professional, learned of the foreclosure and accompanied her aunt to file a complaint with the Department of Consumer Affairs. Allen filed a lis pendens on the property in January 2007; and, in response, Barnett filed an unlawful detainer against King to evict her from her home. The parties mediated the dispute and reached an agreement that required Barnett and Odom to make payments on the secured loans, but the payments were never made. After a notice of default was recorded in August 2007, King sued. The property was returned to her, but the encumbrances remained.

e. *The Sedwick/Lewis transaction*

Freddie Marie Sedwick purchased her South Los Angeles home in 1990. In 2005 she added her daughter Kimberly Lewis to the title. In December 2005 Sedwick and Lewis refinanced the home with a $330,000 loan from Countrywide Home Loans. In July 2006 they obtained a home equity line of credit of $24,000, also secured by a deed

11

of trust, serviced by Ress Financial Corporation to finance improvements to the home. By December 2006 they were in default on the Ress loan in the amount of $2,480.43. In early 2007 they also failed to make several payments on the Countrywide loan. On April 3, 2007 Ress recorded a notice of trustee's sale setting a foreclosure sale for April 24, 2007.

A Trusperity employee came to the home and told Lewis Trusperity could help resolve their financial issues. Lewis met with Barnett in his office. Barnett told her he could help and could be trusted because he was a Christian. Although Barnett first told Lewis he would help her get a loan, he eventually told her to do so he would have to put the house in someone else's name. Lewis rejected the proposal at first but, faced with a lack of options, ultimately agreed. She and Sedwick signed documents acknowledging their property would be brought out of foreclosure by Barnett and sold as a regular residential property; verifying Sedwick was of sound mind and competent to enter the transaction; and affirming they had read the documents and were not under duress or undue influence. They also signed an equity purchase agreement to sell the property to Gregory Matta (at the same address as other equity purchasers identified by Barnett), who would obtain loans totaling $570,000.

An escrow account was opened in April 2007 identifying the buyer of the home as Jason Burkley and the sale price of the property as $570,000. Lewis and Sedwick signed a document waiving their rights under HESCA to rescind the sale within two years if the purchaser took unconscionable advantage of them and a lease requiring them to pay rent of $1,395 to Burkley for two years. The lease contained a purchase option at the price of $525,000 to be exercised during the second year of the lease term and notified them of Burkley's right to sell or encumber the property. Barnett told Lewis he would refinance the home and she would be able to get the house back in her name.

On May 9, 2007 Countrywide recorded a notice of default against the property identifying a loan deficiency of $11,923.38, and Ress's successor, Orion Financial Group, sent notice to Trusperity that it would cost $24,114.57 to bring the home improvement loan into compliance. Lewis learned Barnett had failed to make any

12

payments on the loans, as promised. When confronted, Barnett told Lewis the original buyer did not have his finances together and Barnett would proceed with a different buyer. He opened a new escrow account identifying Dealpoint as the buyer, and Sedwick and Lewis signed a grant deed transferring their property to Dealpoint. They also signed amended escrow instructions directing that all proceeds from the sale be disbursed to Dealpoint at the close of escrow. The price of the property was reduced to $416,000, to be funded by a $250,000 loan and a loan from Lewis and Sedwick to the buyers of $166,000. A representative of Dealpoint executed a note promising to pay Lewis $166,000 by December 1, 2007 and a deed of trust securing the note.

Anchor funded the $250,000 loan on July 5, 2007. Nearly $50,000 of that loan went to pay the Orion loan (including penalties and interest), and the escrow company disbursed the remaining $180,245.82 to Dealpoint. The Countrywide loan was not paid.

In late 2007 Lewis learned Barnett had not been making payments to Countrywide. He claimed he had no money and asked her to wire him $6,000. She then learned her home was in foreclosure and confronted Barnett because her mother had nowhere to go if forced out of the house. Barnett told her he did not want to hear it because she had entered the transaction and knew what she was doing. Sedwick died in March 2010, and Lewis was ultimately evicted from the property.

### f. *The breakdown of profits on the equity sales*

Real estate expert Dean Cloud reviewed the transactions and determined the homeowner victims received the following amounts for the sale of their homes: Baker—$12,000; Hitchens—$7,000; Iverson—$6,000; King—$0; and Sedwick—$0. According to Cloud, Barnett collected $182,615.86 for the Baker transaction; $131,202.47 for the Hitchens transaction; $251,176.88 for the Iverson transaction; $153,496.80 for the King transaction; and $180,245.82 for the Sedwick transaction. Cloud further opined Barnett had violated HESCA by failing to provide the full cancellation period to several of the homeowners, by failing to ensure the transactions proceeded in accordance with the disclosures contained in the equity purchase agreements, by making prohibited payments to several of the homeowners during the cancellation period and by omitting crucial facts

13

from the documents signed by the homeowners. Cloud also opined, had any of the homeowners not entered into a home equity sales contract with Barnett and then defaulted on his or her loan, the lender would have foreclosed and the property sold. In that case, however, the homeowners would have received any excess sale proceeds available after all liens had been satisfied.

  4. *The Verdicts and Sentencing*

  The jury convicted Barnett of five counts of illegal purchase of equity in real property, five counts of theft of real property, six counts of procuring and offering false documents for recording, and one count of theft from an elderly person.[7] It also found the offenses were related fraudulent felonies involving the taking of more than $500,000.

  The trial court found Barnett had suffered two prior serious or violent felony convictions within the meaning of the three strikes law but granted his motion to dismiss one prior conviction with respect to all counts except count 13 for theft from an elderly person. For that count the court sentenced Barnett to an indeterminate state prison term of 25 years to life and imposed consecutive, determinate terms totaling 8 years 4 months on four of the five counts of theft of real property, plus the enhancement for taking more than $500,000 in related felonies.[8] It stayed imposition of sentence on the remaining counts under section 654.

---

[7]   Barnett was acquitted on the forgery and burglary charges.

[8]   In calculating this sentence the trial court erred in imposing consecutive subordinate term sentences (one-third the middle term doubled) on all four counts subject to determinate sentencing, rather than selecting one of those counts to serve as the principal determinate term and imposing the full upper, middle or lower term (doubled) on that count, with the remaining unstayed terms treated as subordinate terms under section 1170.1. (See, e.g., *People v. Rodriguez* (2012) 207 Cal.App.4th 204, 210-211 [trial court separately determines sentence to be imposed for indeterminate term crimes and determinate term crimes]; see also *People v. Garza* (2003) 107 Cal.App.4th 1081, 1094 [when a defendant is sentenced to both a determinate and an indeterminate term, "'neither term is "principal" [n]or "subordinate." *They are both considered and calculated independently of one another*'"].)

**DISCUSSION**

1.  *The Right To Discharge Retained Counsel*

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' . . . [A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 [126 S.Ct. 2557, 165 L.Ed.2d 409]; accord, *People v. Ramirez* (2006) 39 Cal.4th 398, 422 [quoting *Gonzalez-Lopez*]; *People v. Gzikowski* (1982) 32 Cal.3d 580, 587 ["[t]he right to effective assistance of counsel [citations] encompasses the right to retain counsel of one's choice"].)

A criminal defendant's constitutional right to counsel of his or her choice includes the right to discharge privately retained counsel at any time with or without cause—that is, without the showing of irreconcilable conflict or inadequate representation required before appointed counsel may be replaced under *People v. Marsden* (1970) 2 Cal.3d 118. (*People v. Ortiz, supra,* 51 Cal.3d at p. 983; *People v. Munoz* (2006) 138 Cal.App.4th 860, 866.) When, as here, the request is to replace retained counsel with appointed counsel, economic status does not dictate a different result: "[I]t is ordinarily appropriate to require the defendant who is seeking to substitute one appointed counsel for another to show cause, [i.e., a conflict or incompetency], because he is requesting duplicative representation and repetitive investigation at taxpayer expense. That is *not* the case here: defendant is requesting appointed counsel for the first time . . . . Accordingly, he should be treated no differently from a defendant who qualifies for representation by, and seeks appointment of, the public defender at the outset of the proceedings against him." (*Ortiz,* at p. 986; accord, *Munoz,* at p. 868.)

The "right to discharge his retained counsel, however, is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice.'" (*People v. Ortiz, supra,* 51 Cal.3d at p. 983.) Specifically, the court may deny the request if it would require a continuance of

15

the trial or posttrial proceedings and the defendant has been "'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.'" (*People v. Courts* (1985) 37 Cal.3d 784, 790-791; see *United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 152 [trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness" and "against the demands of its calendar"].) Nonetheless, "[b]lanket generalizations about possible delay will not suffice. 'To exercise the power of judicial discretion [in ruling on motion to relieve retained counsel], all material facts and evidence must be both known and considered, together with legal principles essential to an informed, intelligent and just decision.'" (*People v. Munoz, supra*, 138 Cal.App.4th at p. 870.) "'[A] myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.'" (*Ortiz,* at p. 984; accord, *Munoz*, at p. 870.) Instead, the court should "balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution." (*People v. Lara* (2001) 86 Cal.App.4th 139, 153 (*Lara*).)

Denial of a defendant's constitutional right to be represented by retained counsel of his or her choice is "structural error" requiring reversal without any showing of prejudice. (*United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 150 ["erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error"'"]; *People v. Ortiz, supra,* 51 Cal.3d at p. 988 ["[r]eversal is automatic, however, when a defendant has been deprived of his right to defend with counsel of his choice"].)

2. *The Trial Court Improperly Denied Barnett's Request for Appointed Counsel*

The People oppose Barnett's claim he was improperly denied his right to substitute counsel on two grounds: (1) Barnett did not clearly indicate he wished to discharge his retained counsel; and (2) the trial court acted within its discretion because Barnett's request was untimely and would have resulted in the disruption of the orderly processes of justice.

16

a. *Barnett made a cognizable request for appointment of new counsel*

The parties agree there is a relatively low threshold for finding a defendant has requested replacement of his or her counsel. In the context of a *Marsden* motion to replace appointed counsel, a "proper and legal motion" is not required; to the contrary, a defendant need only give "some clear indication . . . he wants a substitute attorney." (*People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8; accord, *People v. Mendoza* (2000) 24 Cal.4th 130, 157; see also *People v. Sanchez* (2011) 53 Cal.4th 80, 89-90 [trial court is obligated to conduct *Marsden* hearing when there is "'at least some clear indication'" a substitute attorney is desired].) Once a defendant indicates he wants replacement counsel—which typically occurs because the defendant is dissatisfied with his existing counsel—"'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.'" (*Lara, supra,* 86 Cal.App.4th at p. 150.) "The court's duty to conduct the inquiry arises 'only when the defendant asserts directly or by implication that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel.'" (*Id.* at p. 151.)

In *Lara* the trial court applied these general principles, developed in the *Marsden* context, to a defendant's effort to replace his retained counsel. On the first day of trial Lara's retained counsel informed the court Lara had some complaints about his representation. (*Lara, supra,* 86 Cal.App.4th at p. 157.) The trial court wrongly construed Lara's request to discuss the performance of his counsel as a request for a *Marsden* hearing. (*Id.* at p. 158.) Finding Lara's complaints inadequate, the court denied the motion. (*Ibid.*) The appellate court reversed. After pointing out the trial court had improperly relied on *Marsden* to resolve Lara's complaint about retained counsel, the court rejected the People's contention Lara had never expressly requested to discharge his attorney: "While the trial court improperly conducted a *Marsden*-type hearing in this case, we may rely on the court's factual interpretation of the situation as involving a request by [Lara] to discharge his defense attorney and obtain a new attorney to represent him in this matter. We thus conclude that [Lara's] complaints about his defense counsel were sufficient to implicate his right to discharge his retained counsel, and either hire a

17

new attorney or request the appointment of counsel." (*Ibid.*) Tellingly, the appellate court observed, "the trial court never asked [Lara] if he was still willing to proceed to trial despite his disagreements with [counsel]. Such an inquiry would have settled the issue as to whether [Lara] was still unsatisfied with [his counsel's] representation." (*Ibid.*)

The same problem existed here. Barnett did not say he wanted to discharge Konstantelos, even when asked directly by the trial court. However, the court's inquiry was inadequate. The letters that Barnett had sent, which initiated the discussion, clearly stated Barnett's concern his inability to pay counsel had jeopardized his defense, asserted he was indigent, and requested appointment of replacement counsel. At the pretrial conference the court asked Konstantelos about the dispute, and Konstantelos forthrightly acknowledged she had not spent sufficient time on the case and explained Barnett's inability to pay had resulted in her taking other matters to "keep the business afloat." Barnett asked permission to speak and told the court he had had no contact with Konstantelos and needed assistance to prepare his case. The court expressed its concern about further delays and asked Barnett, "Are you saying you want to discharge [Konstantelos]?" When Barnett answered by referring to the letters he had sent the court, the court said it had only briefly looked at one of the letters. Barnett then stated unequivocally, "What I'm requesting, your honor, is, with all due respect, if I can get a state-appointed attorney to represent me. . . . I'm not asking for a delay, but what I am asking for is representation because I'm fighting for my life."

The remainder of this exchange confirms the court (and the prosecutor, for that matter) understood Barnett sought to replace Konstantelos. Responding to Barnett's request, the court warned, "If I appoint a new lawyer and they have a box of evidence to review, the first three words out of their mouth is 'I'm going to need a continuance to be prepared.' So it's not so simple as you're putting it." The court then asked for the People's position. The prosecutor stated, "[I]f there is a new attorney, could the court . . . make sure somebody is ready within the 70 days? It's zero of 70 now, which is not impossible. . . ." The court answered, "I don't know if that's going to be the final result. I

know that's what you want, but I have to make some determinations. . . ." The court chastised Konstantelos for failing to raise the issue earlier. When Konstantelos stated she had called the clerk more than a month earlier to pass on the information, the court remonstrated that a call to the clerk is not an appropriate way to bring something before the court. Konstantelos reminded the court she was not asking to be relieved. The court responded: "That basically ends the story, then. If he's not asking you to—he's not discharging you, and you're not asking to be relieved. There's nothing else I can really do in this. You are the lawyer. . . . I'm going to do some other checking . . . [but] right now I'm going to indicate you're on. Get ready. *And despite what [Barnett] indicates, you will be the lawyer.*"

Including his letters to the court, Barnett repeated his request for appointment of counsel on three occasions. He clearly believed he would receive a less-than-adequate defense unless new counsel was appointed for him at the state's expense, as was his right as an indigent defendant. The court's concern with timing was, of course, legitimate, but the court appeared to seize upon the possibility of paying Konstantelos to continue as counsel,[9] a proposition it investigated but denied a week later without returning to Barnett's original request. To paraphrase *Lara,* "the trial court never asked [Barnett] if he was still willing to proceed to trial despite his disagreements with [Konstantelos]. Such an inquiry would have settled the issue as to whether [Barnett] was still unsatisfied with [Konstantelos's] representation." (*Lara, supra,* 86 Cal.App.4th at p. 158.) Whether Konstantelos's performance at trial was adequate—and Barnett contends it was not—his situation mirrored the concerns articulated by the Supreme Court in *People v. Ortiz, supra,* 51 Cal.3d at page 985: "The risk in compelling a defendant to go to trial with unpaid counsel against his wishes and those of his attorney, is that the defendant will 'get what he paid for.'" Konstantelos may have been willing to continue as Barnett's counsel, in accord

---

9    As discussed, after listening to the prosecutor's request that new counsel, if one was appointed, be ready in 70 days, the court said, "The other thing that came to mind— but I think it's dramatically frowned upon; I don't think I should do it— is to appoint the lawyer who takes the case privately and then have her appointed as a public lawyer. . . ."

19

with her ethical duty, but by her own admission she had been forced to spend time on other matters precisely because she was not being paid.

   b. *Barnett's request was timely*

  The People's second contention—that the court did not abuse its discretion by concluding Barnett's request was untimely—lacks merit. We have found no case in which a defendant's request to discharge retained counsel more than two months before trial was found to be untimely. (Cf. *Lara, supra,* 86 Cal.App.4th at pp. 162-163 [reversing denial of request for appointed counsel made on first day of trial]; *People v. Stevens* (1984) 156 Cal.App.3d 1119, 1128 [reversing denial of defendant's request for appointed counsel made two weeks before trial].) Plainly the court was concerned about the impact of delay on the elderly witnesses expected to testify against Barnett, but there was no indication those witnesses would be unavailable were the trial to proceed a short time later. In fact, the witnesses could hardly complain of undue inconvenience because the trial date had not yet been set. Moreover, as the *Stevens* court observed, "[t]here is not the slightest indication that [defendant's] purpose in seeking substitution was a desire to delay the proceedings." (*Stevens,* at p. 1129.) Under these circumstances the court's concern was insufficient to justify denial of Barnett's request for appointed counsel.

  3. *The Jury's Verdicts Were Supported by Substantial Evidence*

  "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." (*Burks v. United States* (1978) 437 U.S. 1, 11 [98 S.Ct. 2141, 57 L.Ed.2d 1].) To avoid placing a defendant in double jeopardy, a reviewing court that reverses a conviction due to legal error must assess the defendant's challenges to the sufficiency of the evidence to determine whether the defendant may be retried for some or all of the offenses. (See *People v. Morgan, supra,* 42 Cal.4th at p. 613; *People v. Hayes, supra,* 52 Cal.3d at p. 631.) "[T]he defendant . . . may preserve for himself whatever double jeopardy benefits accrued in his first trial notwithstanding some fatal defect in the proceedings." (*People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 72, fn. 14.)

Barnett contends the People presented insufficient evidence to support his convictions for theft of real property (counts 2, 5, 8, 11 and 15), violation of HESCA (counts 1, 4, 7, 10 and 14), theft from an elder adult (count 13) and filing false documents (counts 3, 6, 9, 12, 16 and 20).  To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

  a.  *The theft counts*

Barnett contends his theft convictions are not supported by substantial evidence because the People failed to establish the necessary elements to prove theft of real property by false pretenses, their theory for these offenses.  According to Barnett, theft of real property by false pretenses required proof that each homeowner intended for Barnett "to become the unconditional and unrestricted owner" of his or her property (*People v. Traster* (2003) 111 Cal.App.4th 1377, 1387-1388 (*Traster*)) and that he acquired valid title to the subject property (*People v. Ashley* (1954) 42 Cal.2d 246, 258).  The People's theory founders, he argues, because a grant deed executed by a "grantor [who] is unaware

of the nature of what he or she is signing" "is void." (*Schiavon v. Arnaudo Brothers* (2000) 84 Cal.App.4th 374, 378; see *Erickson v. Bohne* (1955) 130 Cal.App.2d 553, 556 ["'where its execution is secured by misrepresentation as to its nature, or it is delivered under a representation that it is an instrument of an entirely different character, a deed is void and title remains in the purported grantor'"].)

Barnett's argument is without merit. While it is true the jury was instructed on the crime of theft by false pretenses,[10] this court in *Traster, supra,* 111 Cal.App.4th 1377 held, if the evidence satisfied the requirements for a conviction on one theory of theft or larceny, an error in instructing on a different theory was harmless. (*Id.* at pp. 1389-1390; see *People v. North* (1982) 131 Cal.App.3d 112, 117-118 [theft conviction may be upheld as long as there is sufficient evidence under any theory of theft to support the conviction, even if jury was not instructed on the relevant theory of theft].) As we explained in *Traster* the "fourth element" required to prove theft by false pretenses "of transferring 'ownership' or 'title' distinguishes the crime of theft by false pretenses from the crime of theft by trick and device. . . . [T]he crimes of larceny by trick and device and obtaining property by false pretenses are . . . aimed at different criminal acquisitive techniques. Larceny by trick and device is the appropriation of property, the possession of which was

---

10    Pursuant to CALJIC No. 14.10, the jury was instructed: "Defendant is accused in Counts 2, 5, 8, 11 and 15 of having committed the crime of grand theft, a violation of section 487 of the Penal Code. [¶] Every person who knowingly and designedly by any false or fraudulent representation or pretense, defrauds another person of money, labor, real or personal property, is guilty of the crime of theft by false pretense. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person made or caused to be made to the alleged victim by word or conduct, either (1) a promise without intent to perform it, or (2) a false pretense or representation of an existing or past fact known to the person to be false or made recklessly and without information which would justify a reasonable belief in its truth; [¶] 2. The person made the pretense, representation or promise with the specific intent to defraud; [¶] 3. The pretense, representation or promise was believed and relied upon by the alleged victim and was material in inducing him or her to part with his or her money or property even though the false pretense, representation or promise was not the sole cause; and [¶] 4. The theft was accomplished in that the alleged victim parted with his or her money or property intending to transfer ownership thereof."

fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession. . . . [¶] Because these crimes share so many similar characteristics, '[t]he distinction between larceny and false pretenses sometimes depends on a close analysis of facts and legal principles.' If 'title still remains in the owner, larceny is established: while the crime is false pretenses, if the title, as well as the possession, is absolutely parted with.'" (*Traster,* at p. 1388 [citations and fns. omitted].)[11]

In this case the People argued to the jury Barnett was engaged in an equity-stripping scheme that depended upon his ability to induce homeowners to authorize him—knowingly or unknowingly—to sell their homes and divert the proceeds to his own benefit. The jury was instructed it could convict Barnett in the event it concluded either money or property had been taken from the victims. All of the homeowners lost substantial equity in their homes as a result of Barnett's actions; thus, the jury could reasonably convict Barnett on a theory of either larceny by trick or larceny by false pretenses. In the Baker, Iverson and King transactions, the homeowners did not understand Barnett's scheme resulted in the sale of their homes; and the crime properly may be understood as larceny by trick. In the Hitchens and Lewis/Sedwick transactions, the homeowners understood their homes would be sold but wrongly believed (based on his statements) Barnett would return their homes to them in the future. The jury could have reasonably concluded the homeowners intended to transfer title in those instances, thus allowing them to convict Barnett of theft by false pretenses. As the Supreme Court has observed, so long as the evidence supports the elements of any theory of theft, "[j]uries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful

---

[11]    "The elements of theft by trick and device are: '(1) the obtaining of the possession of the property of another by some trick or device; (2) the intent by the person so obtaining possession to convert it to his own use and to permanently deprive the owner of it; and (3) that the owner, although parting with possession to such person, does not intend to transfer his title to that person.'" (*Traster, supra,* 111 Cal.App.4th at p. 1390.)

taking' has been proved." (*People v. Ashley, supra*; 42 Cal.2d 258; see *People v. Nor Woods* (1951) 37 Cal.2d 584, 586 ["it is immaterial whether or not [jurors] agreed as to the technical pigeonhole into which the theft fell"].) The evidence was more than adequate for this purpose.

      b.   *The HESCA violations*

Barnett contends the Baker, Iverson and Hitchens transactions were not subject to HESCA and there were no substantive HESCA violations in the King and Lewis/Sedwick transactions. The record belies his argument.

Civil Code section 1695.8 criminalizes violations of HESCA's specific requirements, as well as any actions constituting fraudulent or deceitful practices: "Any equity purchaser who violates any subdivision of [Civil Code] Section 1695.6 or who engages in any practice which would operate as a fraud or deceit upon an equity seller shall, upon conviction, be punished by a fine of not more than twenty-five thousand dollars ($25,000), by imprisonment in the county jail for not more than one year, or in the state prison, or by both that fine and imprisonment for each violation." "At the heart of the scheme is the requirement that the agreement between buyer and seller be in writing, with specific terms aimed at protecting the homeowner. ([Civ. Code], §§ 1695.2, 1695.3, 1695.5.) The contract must include the total consideration given, terms of payment and terms of any rental agreement; a conspicuous statement of the right to cancel within five business days or until 8 a.m. on the day scheduled for foreclosure, with an attached notice of cancellation; and a conspicuous notice that until the right to cancel has ended, the equity purchaser cannot ask the seller to sign a deed or any other document. ([Civ. Code], §§ 1695.3-1695.5.) The equity purchaser must provide, and complete, the contract in conformity with these terms. ([Civ. Code], § 1695.6, subd. (a).) [¶] 'During the 'cooling off' period, the equity purchaser cannot take title to the property by written instrument or recordation thereof; transfer or encumber any interest in the property; or pay the seller any consideration. ([Civ. Code], § 1695.6, subd. (b).) Moreover, the purchaser cannot make untrue or misleading statements about the value of the property, any foreclosure proceeds, or the terms of sale. ([Civ. Code], § 1695.6, subd. (d).)

24

Additionally, when the seller grants the residence by an instrument purporting to be an absolute conveyance but reserves or is given an option to repurchase, the equity purchaser cannot grant any interest in the property to another without the written consent of the seller. ([Civ. Code], § 1695.6, subd. (e).) Finally, it is unlawful to take unconscionable advantage of the property owner in foreclosure. ([Civ. Code], § 1695.13.) Depending on the nature of the violation, the aggrieved seller may be entitled to rescission, other equitable relief or damages, including exemplary damages. ([Civ. Code], §§ 1695.7, 1695.14.)'" (*Segura v. McBride* (1992) 5 Cal.App.4th 1028, 1034-1036, fns. omitted; accord, *Boquilon v. Beckwith* (1996) 49 Cal.App.4th 1697, 1709-1710.)

Barnett renews his argument that Baker and Iverson, because they never intended to sell their homes, could not convey title to Barnett; consequently, he asserts, HESCA does not apply. That is nonsense. The transactions solicited by Barnett fell squarely within the purview of HESCA, which was "enacted to protect homeowners who are faced with foreclosure proceedings and may find themselves at the mercy of unscrupulous individuals who 'induce homeowners to sell their homes for a small fraction of their fair market values through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices.'" (*Boquilon v. Beckwith, supra,* 49 Cal.App.4th at p. 1709, quoting Civ. Code, § 1695, subd. (a).) The legal conclusion any title purportedly passed to Barnett was void does not vitiate the fact that Barnett sought and procured a grant deed from a homeowner in foreclosure. Barnett was able to act on those deeds and use them to extract the equity from the homes for his own benefit.

Barnett contends the Hitchens transaction likewise fell outside the scope of HESCA because of the possibility he had technically cured his default for a limited and undefined period of time during his negotiations with Barnett. Barnett approached Hitchens and his mother at the time a notice of default had been recorded. Barnett subsequently convinced Hitchens to sell his home to Barnett so Barnett could refinance the home and return it to Hitchens within 45 days, a promise he did not keep. Again, this

is exactly the kind of transaction targeted by HESCA, and a technical argument the home may not have been in foreclosure at the moment of sale is unavailing. As the People point out, there is no evidence in the record Wells Fargo reinstated the loan; and we will not second-guess the jury's conclusion the loan was in default.

With respect to the King transaction, the People argued Barnett's conduct fell within the fraudulent practices provision of Civil Code section 1695.8. That Barnett solicited an equity sale from King, who suffered from dementia and was unable to read because of cataracts, and obtained the necessary signatures by reading the documents to King is evidence from which the jury could reasonably conclude Barnett was engaging in fraudulent and deceitful practices. His siphoning of the equity from her home, which included two sales transactions and the burdening of the property with massive debt, amply supported the jury's finding HESCA had been violated.

Barnett concedes he violated HESCA in several aspects (an inadequate cancellation period; variation between the purchase agreement and escrow documents; omission of the rental agreement) with respect to the final transaction involving the Lewis/Sedwick home. Even without these facial violations, Barnett agreed to pay the ongoing debt and failed to do so, resulting in Lewis's eventual eviction from the home.

c. *Theft from an elder (King)*

As explained above, the jury reasonably convicted Barnett of theft in all five transactions, including the King transaction. Mrs. King was in her late seventies at the time Barnett induced her to enter the equity purchase agreement; accordingly, the evidence supporting the conviction was sufficient.

d. *The filing of false documents*

Pursuant to section 115, subdivision (a), it is a felony to "knowingly procure[] or offer[] any false or forged instrument to be filed, registered, or recorded in any public office within the state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States . . . ." "'[S]ection 115 was designed to prevent the recordation of spurious documents knowingly offered for [the] record. [Citation.]' [Citation.] '"The core purpose of . . . section 115 is to protect the

26

integrity and reliability of public records." [Citations.] This purpose is served by an interpretation that prohibits any knowing falsification of public records.'" (*People v. Denman* (2013) 218 Cal.App.4th 800, 808.)

After arguing the grant deeds Barnett procured and recorded in support of several of the transactions were void—and, thus, by any measure, false—Barnett argues he did not know the deeds were false and, therefore, cannot be convicted of the filing of false documents under section 115.[12]

We conclude knowledge the deeds were part of Barnett's equity-stripping scheme constitutes sufficient evidence of their false, or fraudulent, nature. Having already concluded the theft convictions were supported by substantial evidence,[13] Barnett's filing of grant deeds he obtained in the expectation he would use them to siphon the equity from the properties is sufficient to constitute knowledge of falsity within the meaning of Civil Code section 115. (See *People v. Parker* (1967) 255 Cal.App.2d 664, 672 ["'[w]here a person who has no intention of selling or encumbering his property is induced by some trick or device to sign a paper having such effect, believing that paper to be a substantially different instrument, the paper so signed is just as much a forgery as it would have been had the signature been forged'"]; *People v. Denman, supra,* 218 Cal.App.4th at p. 809 ["'[S]ection 115 differentiates between the two categories, clearly proscribing either a false *or* a forged instrument. Obviously, . . . an instrument may have the effect of defrauding one who acts on it as genuine even though it does not bear a forged signature or otherwise meet the technical requirements of a forged instrument.'"].)

---

[12] The jury was instructed the crime of procuring the filing of false documents required knowledge (CALJIC No. 3.31.5), which was defined as "knowledge of the existence of the facts in question. Knowledge of the unlawfulness of any act or omission is not required. A requirement of knowledge does not mean that the act must be done with any specific intent." (CALJIC No. 1.21.)

[13] Theft requires proof of a specific intent to defraud. (CALJIC No. 14.10.)

27

## DISPOSITION

The judgment is reversed and the cause remanded for a new trial with appointed counsel representing Barnett.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28