[No. B158270. Second Dist., Div. Seven. Sept. 15, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN D. TRASTER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I of the Discussion section.

**COUNSEL**

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Michael C. Keller and Robert David Breton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Appellant, Kevin D. Traster, represented himself at trial. A jury found him guilty of two counts of grand theft by false pretenses. We will modify the judgment of conviction to reflect instead one count of grand theft by trick and one count of attempted grand theft by trick. Finding no other prejudicial error, we affirm as modified and remand for resentencing.

## FACTS AND PROCEEDINGS BELOW

*Count II—Alleged Theft at the Law Firm of Demler, Armstrong and Rowland:*

Appellant had a computer consulting business he called Pen, Paper, Mouse Ink. In July 1997 the Long Beach law firm of Demler, Armstrong and Rowland hired appellant as its first computer administrator. His initial duties included converting the firm from the word processing system WordPerfect 5.1 to Windows and Microsoft Word. His responsibilities also included training on Microsoft Word as well as assisting the 35 attorneys and 35 staff persons with computer problems.

In April 1999, appellant met with Susan Stevens, the law firm's administrator. He informed her the law firm was not in legal compliance because it did not have Microsoft licenses for all its computers. Appellant explained he had done some research on the Internet and discovered he could acquire the necessary Microsoft licenses at a large discount from Billpoint Company. Appellant stated it would cost $37,290.94 to acquire licenses for the firm's 65 computers.

Neither Ms. Stevens, nor the accounting supervisor, Ms. Hagopian, nor anyone else supervising appellant had any special knowledge about computers. Ms. Stevens said she would present appellant's proposal to the firm's partners for decision. Appellant filled out a purchase order form for $37,290.94 for the purchase of 65 licenses for Microsoft Office and Windows 98 software.

On April 27, 1999, the partners approved the expenditure to acquire the necessary Microsoft licenses. They gave appellant the partnership's credit card to buy the licenses from Billpoint Company, the vendor appellant named on the purchase order.

Appellant resigned from his position a few days later on May 3, 1999. Before he left Ms. Stevens asked appellant whether the Microsoft licenses

had been received, and if so, where he had placed them. Appellant said the licenses were in a locked filing cabinet in the paralegal office.

On May 6, 1999, Ms. Stevens and her assistant searched everywhere and did not find the licenses. She called appellant at home. Appellant reiterated the 65 licenses were in the locked filing cabinet in the paralegal room. Ms. Stevens called appellant again after a second unsuccessful search. Appellant offered to call the vendor, Billpoint Company, to ask them to send the firm additional licenses, or copies of the licenses, by facsimile transmission.

Later that day Ms. Stevens received a five-page fax, purportedly sent from the Billpoint Company. There were several things about the fax transmission which made Ms. Stevens suspicious. The law firm's name was incorrect, the Microsoft certificate of authenticity was illegible, the products purportedly purchased were incorrect, and the alleged purchase price was incorrect. Ms. Stevens reported her suspicions to law firm partner, Mr. Michael Wade.

The next morning Mr. Wade and Ms. Stevens called the Billpoint Company. They described the fax purportedly sent to the firm by the Billpoint Company and inquired about the Microsoft licenses the law firm had purportedly purchased from Billpoint. The Billpoint representative explained Billpoint was not a vendor of any product, was not a software company, and did not sell software licenses. The representative explained Billpoint was primarily a credit card processing company for e-Bay but processed other Internet transactions as well. The representative stated Billpoint functioned solely as a clearinghouse between buyers and sellers.

On May 14, 1999, appellant called the law firm and left a message on Ms. Stevens voice mail. He asked Ms. Stevens if she was aware the transaction for the purchase of the Microsoft licenses had been cancelled, and asked whether the firm was prepared to return the licenses. Ms. Stevens returned appellant's phone call. During their conversation appellant reiterated the firm had in fact purchased the licenses from Billpoint on April 27, 1999. When Ms. Stevens told appellant the law firm had nothing which appeared to be a legitimate license, appellant again offered to help by getting Billpoint to fax the firm copies of the licenses it had allegedly purchased.

Ms. Stevens and Mr. Wade called Billpoint again. This time they spoke to a representative in Billpoint's fraud department. While they were on the phone to Billpoint the law firm received a seven-page fax purportedly on Billpoint letterhead, sent by a person named "Claire," and addressed to Ms. Stevens at the (again incorrectly named) law firm. The fax referred to the earlier fax of May 6 and purported to include an invoice and additional copies of Microsoft licenses. The message on the cover sheet stated Billpoint required payment

for the licenses previously received and requested the credit card holder to please send a letter authorizing the previous charges of $37,290.94.

Ms. Stevens asked the Billpoint representative whether anyone at Billpoint had just sent them a fax. The person at Billpoint stated no one had used the facsimile machine which happened to be right next to his desk. Ms. Stevens sent Billpoint the fax the law firm had just received to verify its authenticity. The Billpoint representative called Ms. Stevens back within minutes. He confirmed the documents were phony, stating the invoice did not even resemble Billpoint's invoices.

Ms. Sherry Jones is a senior fraud investigator at e-Bay and Billpoint. She explained appellant had established a seller's account with Billpoint in December 1998 in the name of his consulting firm, Pen, Paper, and Mouse Ink, at his residence address. She explained typically a seller sends e-mails to potential buyers with a link which directs them to send their credit card payment to the seller's account at Billpoint. Buyers who respond to the seller's e-mail provide their credit card number on the computer on the seller's link to Billpoint. Sellers then receive payment to their bank account within three to five days.

According to Billpoint's computer records, appellant made two credit card transactions through Billpoint on April 27, 1999. In the transaction appellant charged two amounts totaling $37,290.94 to the law firm's credit card to purchase some "bundled software licenses" from his company Pen, Paper, and Mouse Ink. The transactions were posted to Billpoint the next day on April 28, 1999, and the law firm's credit card account was debited accordingly. However, the transaction was automatically suspended within 48 hours because of Billpoint's $2,000 cap on single transaction charges. The cardholder at the law firm subsequently authorized the transaction telephonically. However, Mr. Wade cancelled the transaction with Billpoint and the credit card company both verbally and in writing before appellant's company's account could be credited.

The debit to the law firm's credit card account was reversed within the month. However, the law firm's credit line was reduced by this amount between April 28, 1999, and May 24, 1999.

The law firm ultimately purchased the Microsoft licenses it needed for $20,000.

A few months later appellant went to work for the Demenno/Kerdoon Company.

*Count I—The Theft at the Demenno/Kerdoon Company:*

The Demenno/Kerdoon Company is a recycling company of primarily oil and paint and is located in Compton. In 1999 the company hired appellant as its computer systems operator. His initial duties included resolving problems associated with the Y2K problem, switching the accounting software, and creating a computer network for the company's related entities.

Initially appellant reported directly to the chief financial officer, Robert Colclough. In early October 1999 appellant wrote a memo to Mr. Colclough to inform him the company was not in compliance because it was using a Microsoft operating system without a license. In his memo appellant stated he was a member of the National Computer Resellers Association. Appellant stated he had accrued bonus points with this organization which he could use to purchase licenses for all the company's users at a substantial savings. Appellant explained how he could get the necessary Microsoft licenses at 75 percent of their normal cost, or $134,420 including tax.

Mr. Colclough presented appellant's proposal to Steve Kerdoon, the company's chief operating officer. They agreed the company needed to be in compliance and authorized appellant to purchase the Microsoft licenses. Appellant explained the purchase price for the licenses had to be paid to him. Colclough and Kerdoon assumed appellant would in turn be paying the National Computer Resellers Association to acquire the licenses. Colclough and Kerdoon inquired whether it would be acceptable to make this payment in three installments. Appellant assured them this form of payment was acceptable.

With their agreement, the company gave appellant a check for $41,296. Shortly thereafter, the company gave appellant a second check for $51,000. Appellant cashed both checks.

By December 1999 several other managers in the company complained they could not get along with appellant. Some company officers expressed dissatisfaction with appellant's work, claiming the computer system was still not working properly. The company dismissed him on December 13, 1999.

Before leaving the company's employ appellant reminded Kerdoon the company had not yet paid him the remaining balance for the purchase of the Microsoft licenses. Kerdoon immediately wrote appellant a check for $40,000.

After appellant's dismissal the company hired Joel Patterson to replace appellant as its chief information officer. In January 2000 Patterson informed

the company's controller the company needed to acquire Microsoft licenses for its existing programs. The controller told Patterson appellant had already acquired the necessary licenses. The controller told Patterson to speak with Messrs. Kerdoon and Colclough.

Patterson and others searched for the licenses without success. Finally on January 13, 2000, Colclough called appellant at home and asked him why the company had not yet received the Microsoft licenses. Appellant claimed the company had received the licenses. He offered to fax Colclough copies of the licenses and proof the licenses had been received.

The next day the company received a nine-page fax with a cover sheet explaining the attachments were copies of Microsoft and GNU licensing agreements. The copies of GNU licenses, or free general public licenses, were for types of software downloaded free off the Internet. The copies of purported Microsoft licenses were simply Microsoft agreements included in all Microsoft software programs which bind the user to specified uses of a Microsoft license, assuming one had a license.

On the cover sheet appellant wrote: "Dear Bob: Here is [sic] copies of Microsoft and GNU licensing agreements. As we discussed, the licensing is for all four companies, D.K., D.K.E., A.E.S. and A.E.I. I was in the process of using GNU software to replace Microsoft before I was terminated, but you had GNU licenses for all the computers for all four companies in all locations. You should have received hard copy [sic] of Microsoft licenses with the products. I know there were copies of these licenses and U.A. licenses packed in my desk before I left. Yours truly, Kevin Traster."

Colclough showed the fax to Patterson and Kerdoon. Patterson confirmed the so-called Microsoft license was not what the company needed or purchased, and was merely a general agreement which anyone could download off the Internet. Moreover, this was the first either Colclough or Kerdoon had even heard about GNU software, or about appellant's claim to have been converting the company's software to GNU.

Kerdoon telephoned appellant, stated no one could find the licenses and asked him directly whether he had purchased the Microsoft licenses. Appellant admitted he had not purchased Microsoft licenses. Colclough and Kerdoon realized appellant had defrauded the company of the money it thought it had spent for the purchase of Microsoft licenses. They called the police.

Colclough telephoned appellant and made it clear he was extremely upset. Appellant responded he would send another fax which would clarify the

situation. When Colclough arrived in his office Monday morning he received a 17-page fax from appellant. On the cover sheet of the fax appellant stated he had secured for the company various kinds of GNU software and attached lists of the types of software received, including backgammon games. According to Patterson, all of the software could have been downloaded free from the Internet. In this fax appellant also stated he had not acquired the Microsoft licenses because he had decided to convert the company's systems to Linux programs which had free software which required no license. This was the first either Colclough or Kerdoon had heard of Linux. Moreover, according to Patterson, Linux software was entirely incompatible with the company's existing Microsoft programs then operating company wide, and installed at great expense. Colclough again called appellant who agreed to come to the office for a meeting.

A detective and a police officer from the then Compton Police Department also attended the January 19, 2000, meeting. At the meeting Colclough asked appellant to return the more than $132,000 he had been given to purchase the Microsoft licenses. Appellant explained he could not return the money because he had spent it.

Thereafter the company filed a civil suit against appellant, received a judgment and placed a lien against his home. The company ultimately acquired the necessary Microsoft licenses for approximately $103,000.

Initially, the People charged appellant with one count of embezzlement from Demenno/Kerdoon. However, the case was dismissed on September 7, 2000, when the People could not produce a key witness. The People filed a new information alleging two counts after they learned of the substantially similar complaints from appellant's previous employer, Demler, Armstrong & Rowland. Sometime before appellant's second preliminary hearing on May 21, 2001, appellant elected to proceed in propria persona. Following his second preliminary hearing an information charged appellant in count I with grand theft by embezzlement and by false pretenses from the Demenno/Kerdoon Company.[1] Regarding this count the information alleged the amount taken from Demenno/Kerdoon exceeded $50,000, potentially subjecting appellant to an additional year of imprisonment,[2] and exceeded $100,000, which would make appellant ineligible for probation.[3] In count II the information alleged appellant committed grand theft by embezzlement

---

[1] Penal Code section 487, subdivision (a).
[2] Penal Code section 12022.6, subdivision (a).
[3] Penal Code section 1203.045, subdivision (a).

and by false pretenses from the law firm of Demler, Armstrong and Row-land.[4] During trial, the trial court granted the prosecutor's request to amend the information to delete the charges of theft by embezzlement.

A jury convicted appellant of both counts of grand theft by false pretenses and found true the special allegations regarding the theft from Demenno/Kerdoon.

Appellant appeals from the judgment of conviction.

## DISCUSSION

### I.  ERROR IN FAILING TO READVISE APPELLANT WHEN ARRAIGNED ON THE SECOND INFORMATION OF THE RIGHT TO COUNSEL AND TO APPOINTED COUNSEL WAS HARMLESS ERROR.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.  APPELLANT WAS CONVICTED ON THE WRONG THEORY OF GRAND THEFT.

To establish the crime of theft by false pretenses the prosecution was required to prove:

"1. A person made or caused to be made to the alleged victim by word or conduct, either (a) a promise without intent to perform it, or (b) a false pretense or representation of an existing or past fact known to the person to be false or made recklessly and without information which would justify a reasonable belief in its truth;

"2. The person made the pretense, representation or promise with the specific intent to defraud;

"3. The pretense, representation or promise was believed and relied upon by the alleged victim[s] and was material in inducing [them] to part with [their] money or property even though the false pretense, representation or promise was not the sole cause; and

---

[4] Penal Code section 487, subdivision (a).
[*] See footnote, *ante,* page 1377.

"4. The theft was accomplished in that the alleged victim[s] parted with [their] money or property intending to transfer ownership thereof."[23]

■ The presence or absence of evidence of the fourth element of transferring "ownership" or "title" distinguishes the crime of theft by false pretenses from the crime of theft by trick and device.[24] As our Supreme Court has explained, "Although the crimes of larceny by trick and device and obtaining property by false pretenses are much alike, they are aimed at different criminal acquisitive techniques. Larceny by trick and device is the appropriation of property, the possession of which was fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession. [Citations.] In this state, these two offenses, with other larcenous crimes, have been consolidated into the single crime of theft (Pen. Code, § 484), but their elements have not been changed thereby. [Citations.]"[25]

■ Because these crimes share so many similar characteristics, "[t]he distinction between larceny and false pretenses sometimes depends on a close analysis of facts and legal principles."[26] If "title still remains in the owner, larceny is established: while the crime is false pretenses, if the title, as well as the possession, is absolutely parted with."[27] Stated differently, if the defendant obtains possession of property for a specific or special purpose, the owner does not relinquish title and the crime committed is larceny by trick.[28] On the other hand, it is theft by false pretenses if the owner of the property gives the property to the defendant or another he controls intending the defendant or this other entity to become the unconditional and unrestricted owner.[29]

---

[23] CALJIC No. 14.10, italics added.

[24] We requested letter briefs asking the parties to address the issues (1) whether the record contained evidence the victims intended appellant to have the funds, or access to the funds, unconditionally or only for a specified purpose; (2) if the latter, whether the crimes in the present case were then more properly characterized as larceny by trick; (3) and if so, what remedies were available to this court to address the error if the evidence is insufficient to support the convictions for theft by false pretenses and further insufficient to establish a completed theft crime to sustain the conviction of theft by false pretenses against the law firm.

[25] *People v. Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271].

[26] *People v. Delbos* (1905) 146 Cal. 734, 736 [81 P. 131].

[27] *People v. Delbos, supra,* 146 Cal. 734, 737.

[28] *People v. Delbos, supra,* 146 Cal. 734, 736 money given to the defendant was meant for the seller of the property and thus the seller did not intend to pass title to the defendant; 2 Witkin and Epstein, California Criminal Law (3d ed. 2000) Crimes Against Property, section 64, page 92.

[29] *People v. Jones* (1950) 36 Cal.2d 373 [224 P.2d 353] victims fraudulently induced to purchase partnership interests in the defendant's failing business; 2 Witkin and Epstein, California Criminal Law, *supra,* Crimes Against Property, section 64, page 92.

A noted treatise writer explains the difference between the two crimes when the property at issue, as in this case, is cash. "In most cases one who hands over money to another never expects to get that very money back; and so it might be thought that in most cases of money obtained by fraud the wrongdoer obtains title, making his crime false pretenses rather than larceny by trick. It is, of course, possible to pledge money as security, or to bail money for safekeeping, to the wrongdoer, in which case title does not pass, so that the crime, if any, falls into the larceny-by-trick category. What if the money is not pledged as security or bailed for safekeeping, but handed over to … the wrongdoer to do something particular with it, something which when performed precludes any chance of the return of the identical money? It is generally held that where the victim hands money to the wrongdoer with the understanding that the latter is to spend it only for a particular purpose (thus creating an agency or trust, it would seem) title does not pass to the wrongdoer; he has only a power to pass title by spending it for the specified purpose. Thus where the victim hands money to the wrongdoer to be invested on the stock marker, or to purchase specified property, or to bribe a particular official, and the wrongdoer, instead of thus dealing with the money, absconds with it, the crime is larceny by trick rather than false pretenses, the wrongdoer never having acquired title."[30]

The law is the same in California. "It is essential in such cases [larceny by trick] that the owner shall intend to part with the possession only, and not to pass the title as well. If he intends to pass both the possession and the title, the transaction, though it may amount to the crime of obtaining property by false pretenses, will not constitute larceny. But the owner does not part with the title to the alleged thief where the thing which is the subject of the theft is delivered by the owner to the accused to be applied by the latter to a particular purpose, and the recipient of the property, having obtained the possession fraudulently with the preconceived intention to appropriate the property to his own use, does subsequently convert it to his own use instead of applying it to the purpose contemplated by the owner...."[31]

The evidence in the present case established the victims provided appellant funds, or access to funds, to purchase specified property. Specifically, both victims intended to acquire Microsoft licenses and provided appellant funds for the express purpose of purchasing Microsoft licenses, and for no other reason. Representatives from both the law firm and the company consistently testified the only reason they provided appellant funds was because he promised to use the funds to acquire Microsoft licenses on their behalf. No

---

[30] 2 LaFave and Scott, Substantive Criminal Law (1986) Crimes Relating to Property, section 8.7, page 396.

[31] *People v. Edwards* (1925) 72 Cal.App. 102, 113 [236 P. 944], disapproved on another ground in *In re Estrada* (1965) 63 Cal.2d 740, 748 [48 Cal.Rptr. 172, 408 P.2d 948].

representative from either firm even suggested appellant received the funds unconditionally to use as he wished. Thus, the record evidence establishes beyond dispute the firms did not intend to pass title to the money until or unless it was spent for the specified purpose of purchasing Microsoft licenses, and then only to the ultimate vendor or supplier of the Microsoft licenses.

Because the evidence established appellant never acquired title to the money, the crimes in this case are more appropriately characterized as larceny by trick than as theft by false pretenses. Accordingly, appellant was convicted of theft crimes under an erroneous theory. The question of proper remedy remains.

"In this state, these two offenses, with other larcenous crimes, have been consolidated into the single crime of theft (Pen. Code, § 484), but their elements have not been changed thereby. [Citations.] The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law. Indictments and informations charging the crime of 'theft' can now simply allege an 'unlawful taking.' (Pen. Code, §§ 951, 952.) Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved. [Citations.] The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses. (*People v. Nor Woods* [(1951)] 37 Cal.2d 584, 586 [233 P.2d 897].)"[32]

Thus the error in this case is merely a technical one in which the jury was instructed on a particular theory of theft which turned out to be the wrong one. In these circumstances, the instructional error is harmless.[33] This is particularly so in this case where the instructional error "caused the People to

---

[32] *People v. Ashley, supra*, 42 Cal.2d 246, 258–259, the defendant was not prejudiced by the instructions on larceny by trick and device because evidence established the victims intended to pass both title and possession and thus the defendant could be properly convicted of theft by false pretenses; *People v. Nor Woods, supra*, 37 Cal.2d 584, 586 ("Irrespective of Campouris's intent, however, defendant could be found guilty of theft by one means or another, and since by the verdict the jury determined that he did fraudulently appropriate the property, it is immaterial whether or not they agreed as to the technical pigeonhole into which the theft fell."); see also *People v. North* (1982) 131 Cal.App.3d 112, 118 [182 Cal.Rptr. 126] (a judgment of conviction "must be affirmed if there is sufficient evidence to support a theft conviction on *any* theory.").

[33] *People v. Counts* (1995) 31 Cal.App.4th 785, 792 [37 Cal.Rptr.2d 425]; *People v. North, supra*, 131 Cal.App.3d 112, 117–118.

carry the unnecessary burden of proving [the additional element] of corroboration in order to establish false pretenses."[34]

■ The elements of theft by trick and device are: "(1) the obtaining of the possession of the property of another by some trick or device; (2) the intent by the person so obtaining possession to convert it to his own use and to permanently deprive the owner of it; and (3) that the owner, although parting with possession to such person, does not intend to transfer his title to that person."[35]

■ As appellant recognizes, the evidence established the crime in count I against Demenno/Kerdoon satisfied the requirements for a conviction of larceny by trick. The company gave him three checks worth over $130,000 on the false representation he would use the funds to purchase Microsoft licenses. Instead, appellant absconded with the funds according to his preconceived plan. This evidence is sufficient to sustain a conviction of larceny by trick in count I.

Count II involving the law firm presents a different sort of problem. ■ Appellant made false representations to the law firm about purchasing Microsoft licenses from Billpoint. His false representations induced the law firm to provide him use of the partnership's credit card. Appellant falsely represented he would use the firm's credit card to acquire the licenses intending to instead convert the funds to his own use by having Billpoint transfer the funds into his company's account. The only step remaining to complete the crime of theft was his actual receipt of the money.[36] However, while the evidence established Billpoint debited the firm's credit card for the approximately $37,000, the evidence also established neither appellant nor his company ever gained possession of the money.[37] The transaction was first

---

[34] *People v. Counts, supra,* 31 Cal.App.4th 785, 793.

[35] *People v. Riley* (1963) 217 Cal.App.2d 11, 18 [31 Cal.Rptr. 404]; CALJIC No. 14.05.

[36] The steps appellant took to complete the theft go well beyond mere preparation. Indeed, appellant took every step within his power to take in attempting to commit the theft. He even went so far as to call the law firm to request it to release its hold on the transaction. Accordingly, *his actions are sufficient to establish an attempted theft crime. (People v. Camodeca* (1959) 52 Cal.2d 142, 145 [338 P.2d 903] ["Preparation alone is not enough, there must be some appreciable fragment of the crime committed [and] it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter."]; cf. *People v. Orndorff* (1968) 261 Cal.App.2d 212, 215 [67 Cal.Rptr. 824] [evidence showed only some preliminary preparation insufficient to establish an attempted theft].)

[37] The loss the victim actually and ultimately sustained from the fraudulent representations is immaterial. What is critical is the amount appellant attempted to steal which qualifies the crime as attempted grand theft. In other words, "it is not a defense that no permanent loss occurred; the victim is defrauded if he did not get what he bargained for, even though he may not have suffered a net financial loss; the victim is defrauded even though he may eventually

blocked by Billpoint for being over the normal $2,000 limit. The law firm on discovery of appellant's deceit then canceled the transaction. Billpoint credited the law firm's account for the $37,000 within the month. Because there was no evidence appellant ever obtained possession or control of the firm's money, a theft crime was not completed. Accordingly, he can only be guilty of an attempt to commit the crime of larceny by trick in count II.[38]

## DISPOSITION

The judgment of conviction is modified to reflect a conviction of grand theft by trick and device in count I and is further modified to reflect a conviction of attempted grand theft by trick and device in count II. The cause is remanded for the trial court to exercise its discretion in resentencing appellant in accordance with the modified judgment of conviction.

Perluss, P. J., and Munoz (Aurelio), J.,[*] concurred.

A petition for a rehearing was denied October 1, 2003, and appellant's petition for review by the Supreme Court was denied December 10, 2003.

---

recover the money or property taken from him (*People v. Bryant,* 119 Cal. 595, 597 [51 P. 960]), and subsequent restoration, restitution or repayment is no defense. (*People v. Hand,* 127 Cal.App. 484, 487 [16 P.2d 156].)" (*People v. Brady* (1969) 275 Cal.App.2d 984, 994–995 [80 Cal.Rptr. 418].) In this case the evidence established appellant attempted to steal over $37,000 from the law firm, an amount which patently qualifies the crime as attempted grand theft. (Pen. Code, § 487.)

[38] *People v. Camodeca, supra,* 52 Cal.2d 142, 145 (the only further act necessary to consummate the crime of grand theft was actual receipt of the money); *People v. Layman* (1968) 259 Cal.App.2d 404, 407–408 [66 Cal.Rptr. 267] (verdicts modified to reflect attempted grand theft where the transaction advanced well beyond the planning stage but the would-be thieves never gained possession of the victim's money).

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.