Filed 3/12/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE, | B276786 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA102420) |
| v. | |
| KEVIN MIRELES, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los
Angeles County, Mark C. Kim, Judge. Affirmed.

Jared G. Coleman, under appointment by the Court of
Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler,
Chief Assistant Attorney General, Lance E. Winters,
Assistant Attorney General, Steven D. Matthews and

Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Belinda Reyes (Reyes), a Home Depot asset protection specialist, and Clifton Roth (Roth), a sales associate, watched Kevin Mireles (Mireles) place a universal product code (UPC) sticker for a $4.47 bottle of roach killer on a $39.98 bottle of weed killer, pay $4.47 at a self-checkout station for the $39.98 product, and walk out of the store. Reyes and Roth followed Mireles outside, where Reyes confronted Mireles and a scuffle ensued. Police arrested Mireles; the People charged him with, and a jury convicted him of, second degree robbery under Penal Code section 212.5, subdivision (c),[1] as construed in *People v. Estes* (1983) 147 Cal.App.3d 23.

Mireles appeals from his robbery conviction. He contends the trial court improperly excluded evidence of a prosecution witness's prior felony convictions and improperly admitted evidence of Mireles's prior criminal conduct in violation of Evidence Code section 352, the trial court improperly admitted testimony from an undisclosed rebuttal witness contrary to Penal Code section 1054.1, and the cumulative effect of the trial court's errors deprived him of a fair trial. We requested supplemental briefing from the parties as to whether Mireles's conduct as charged and tried

———————————

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

could constitute robbery in light of *People v. Williams* (2013) 57 Cal.4th 776 (*Williams*).

We hold that Mireles's conduct constitutes robbery and that the trial court did not err with respect to the challenged evidentiary and discovery rulings. Accordingly, we affirm.

## BACKGROUND

### I. The robbery

On August 18, 2015, Mireles entered a Home Depot store in Signal Hill. Reyes watched Mireles take a bottle of weed killer—a "high-theft" item—from the shelf, pull a UPC sticker from his pocket, put it on the weed killer bottle, and scan the bottle at a self-checkout station. The $39.98 bottle of weed killer scanned for $4.47. Mireles paid the $4.47 and exited the store.

Reyes asked Roth to accompany her as an "approach witness" as she followed Mireles from the store and confronted him about the theft. Reyes identified herself to Mireles as "loss prevention" and told him to return the weed killer. When Mireles did not comply, Reyes reached for Mireles's hand and Mireles swung his closed fist at Reyes. Dennis Bott (Bott) approached the Home Depot entrance just as the confrontation unfolded. Bott put his cane around Mireles and restrained him until police arrived.

### II. The trial

The People charged Mireles with one count of second degree robbery under section 212.5, subdivision (c). Mireles pleaded not guilty, and the case proceeded to a jury trial on July 20, 21, and 22, 2016.

At trial, the court granted the People's motion to preclude evidence of Bott's past criminal conduct and denied Mireles's motion to preclude evidence of Mireles's past criminal conduct. The court admitted evidence detailing Mireles's past criminal conduct. Additionally, the trial court allowed Roth to testify for the prosecution as a rebuttal witness over Mireles's objection that the People had not earlier identified Roth as a potential witness. Mireles testified on his own behalf. While he admitted to stealing the bottle of weed killer, Mireles disputed using any "force, fear, or intimidation to get away with the weed killer."

The jury found Mireles guilty of second degree robbery. The trial court placed Mireles on formal probation for three years with various conditions, including 90 days in county jail with credit for time served and good behavior, and 60 days of Caltrans work. Mireles timely appealed.

## DISCUSSION

### I.  Mireles was properly convicted of robbery

Mireles argues that under the teaching of *Williams*, *supra*, 57 Cal.4th 776, his crime was not theft by larceny, but theft by false pretenses. As a theft by false pretenses is not a " 'felonious taking,' " Mireles contends that the People failed to prove one of the essential elements of robbery[2] and,

---

[2] "Robbery is the *felonious taking* of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211, italics added.)

as a result, his conviction must be reversed.  As discussed below, we disagree.

A.    STANDARD OF REVIEW

It is undisputed that Mireles "knowingly and purposefully" placed a UPC sticker from another product on the bottle of weed killer and purchased the $39.98 bottle of weed killer for $4.47—he plainly and repeatedly admitted to doing so at trial.  Accordingly, the question before us is whether Mireles's conduct constituted theft by larceny (the theory on which the trial court instructed the jury), or theft by false pretenses.  "Issues of law, including statutory construction and the application of that construction to a set of undisputed facts, are subject to this court's independent review." (*Hill Brothers Chemical Co. v. Superior Court* (2004) 123 Cal.App.4th 1001, 1005.)

B.    THEFT BY LARCENY VERSUS THEFT BY FALSE PRETENSES

1.    *Theft by larceny*

"The elements of theft by larceny are well settled:  the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away." (*People v. Davis* (1998) 19 Cal.4th 301, 305 (*Davis*).)  "The act of taking personal property from the possession of another is always a trespass *unless the owner consents to the taking freely and unconditionally* or the taker has a legal right to take the property." (*Ibid.*, fns. omitted, italics added.)  "And if the

5

taking has begun, the slightest movement of the property constitutes a carrying away or asportation." (*Ibid.*)

2. *Theft by false pretenses*

"[T]heft by false pretenses involves the *consensual* transfer of possession *as well as title of property*; therefore, it cannot be committed by trespass." (*Williams, supra,* 57 Cal.4th at p. 788, second italics added.) As our Supreme Court has explained, "the acquisition of title involved in the crime of theft by false pretenses precludes a trespass [or theft by larceny] from occurring." (*Id.* at p. 789.) In addition, "theft by false pretenses, unlike larceny, has no requirement of asportation." (*Id.* at p. 787, italics omitted.) "The offense requires only that '(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' [Citation.] The crime of theft by false pretenses ends at the moment title to the property is acquired." (*Ibid.*)

3. *Distinguishing between theft by larceny and theft by false pretenses*

The differences between theft by larceny and theft by false pretenses are illustrated by two decisions by our Supreme Court: *Davis, supra,* 19 Cal.4th 301; and *Williams, supra,* 57 Cal.4th 776.

In *Davis, supra,* 19 Cal.4th 301, the defendant took a shirt from its hanger in a department store, carried it to the sales counter, falsely claimed to have purchased it earlier,

6

requested a refund, and was issued a voucher for credit in the store. By the time the defendant approached the cashier, however, the store's security guards had discovered his activities. While the cashier issued the voucher, she did so at the guards' instruction and with their awareness of the intended crime. (*Id.* at p. 303.) Although the defendant had intended to use deception to obtain both possession and ownership of the credit voucher, he was convicted of theft by larceny, not theft by false pretenses. (*Ibid.*) On appeal, the defendant sought to divide his crime into two acts: (1) his removal of the shirt from its hanger and taking it to the cashier and (2) his false representation to the cashier and acceptance of the voucher. He then argued that the element of trespass was absent because the store issued the voucher while aware of his fraud. In affirming the larceny conviction, Justice Mosk wrote for a unanimous court that the defendant's argument "focuses on the wrong issue of consent . . . . [¶] . . . [T]he question is whether [the store] consented to [defendant's] taking the shirt in the first instance." (*Id.* at p. 306.) Disregarding the latter portion of the transaction, the court found that defendant's taking the shirt from a hanger with the intent to steal it was trespass. Although recognizing department stores are ordinarily presumed to consent to customers' carrying items for sale within the store, *Davis* emphasized that there was no consent to such transport if committed with a larcenous intent: "[A] self-service store . . . impliedly consents to a customer's picking up and handling an item displayed for

7

sale and carrying it from the display area to a sales counter with the intent of purchasing it; the store manifestly does not consent, however, to a customer's removing an item from a shelf or hanger if the customer's intent in taking possession of the item is to steal it." (*Ibid*.)

In *Williams*, *supra*, 57 Cal.4th 776, our Supreme Court once again focused on the issue of consent. In that case, the defendant Williams used a credit card that had been "re-encoded with a third party's credit card information" to purchase a gift card from a novice Walmart cashier, who did not know that such purchases were against company policy—Walmart prohibited the use of credit cards for purchases of gift cards. (*Id*. at pp. 780, 791–792.) After Walmart "permitted" the defendant to keep the first gift card, he tried to purchase more gift cards at a different register; as a result, he came under the scrutiny of the store's loss prevention personnel. (*Id*. at p. 780.) Security guards eventually confronted the defendant; they pointed out to him that the number on his credit card did not match the credit card number on the sales receipt. When the guards attempted to detain the defendant, he pushed past them and ran. He was ultimately apprehended and convicted of robbery, burglary, theft by false pretenses, and other crimes. (*Ibid*.) On appeal, the defendant contended his robbery conviction should be reversed because robbery requires theft by larceny, not false pretenses. (*Id*. at p. 781.) Our Supreme Court agreed. In explaining its acceptance of the defendant's position, *Williams* relied in part on robbery's

requirement of a trespassory taking, which is absent in a theft by false pretenses. "[T]heft by false pretenses involves the *consensual* transfer of possession as well as *title* of property; therefore, it cannot be committed by trespass. . . . [citation] . . . [Citation.] . . . [¶] . . . [D]efendant did not commit larceny. Walmart, through its store employees, *consented* to transferring title to the gift cards to defendant. Defendant acquired ownership of the gift cards through his false representation, on which Walmart relied, that he was using valid payment cards to purchase the gift cards. . . . Because a 'felonious taking,' as required in California's robbery statute [citation], must be *without the consent* of the property owner, . . . [citations], and Walmart *consented* to the sale of the gift cards, defendant did not commit a *trespassory* (nonconsensual) taking, and hence did not commit robbery." (*Id*. at p. 788, third italics added.)

C.   MIRELES COMMITTED THEFT BY LARCENY

Like the defendant in *Davis, supra,* 19 Cal.4th 301, Mireles contemplated a two-step crime—he picked up the bottle of weed killer with the intent to steal it and then placed the UPC sticker for the roach killer product on the bottle and scanned that UPC—not the UPC for the weed killer—at the self-checkout counter. As *Davis* holds, while a retail store such as Home Depot, is ordinarily deemed to consent to its customers' handling of the goods for sale, such consent does not extend to handling them with the intent of stealing. (*Id*. at p. 306.) In contrast to Walmart in *Williams, supra,* 57 Cal.4th 776, Home Depot did not consent at any

time to Mireles's purchase of the $39.98 bottle of weed killer for $4.47. There was never, in other words, a "meeting of the minds" between the store and Mireles as to what product (title) the store was agreeing to transfer to Mireles. In sum, under the teachings of our Supreme Court, Mireles committed a nonconsensual felonious taking and, as a result, was properly convicted of robbery.

In urging that the judgment be reversed, our concurring and dissenting colleague argues that there is "no meaningful distinction between *Williams*[*, supra*, 57 Cal.4th 776] and this case"—"[i]n each case, the defendant *pretended* to pay for the product before absconding." (Conc. & dis. opn. *post*, at p. 4.) We disagree. There is not only a meaningful distinction between *Williams* and the instant case, but a case-defining one.

What distinguishes this case from *Williams*, *supra*, 57 Cal.4th 776, is precisely what distinguishes theft by larceny from theft by false pretenses. As discussed above, theft by false pretenses requires two elements which larceny does not: the consent of the lawful owner to the defendant taking the property; and the lawful owner's reliance on the defendant's false representation. (Compare *Davis*, *supra*, 19 Cal.4th at p. 305 with *Williams*, *supra*, 57 Cal.4th at p. 787.)

In *Williams*, *supra*, 57 Cal.4th 776, even though defendant's purchase of the gift cards was against company policy, Walmart nonetheless "permitted" or consented to the cards' sale. (*Id.* at pp. 780, 792.) As our Supreme Court stated, "defendant did not commit larceny. Walmart,

10

through its store employees, *consented* to transferring title to the gift cards to defendant." (*Id.* at p. 788, italics added.) Here, in contrast, Home Depot did not willingly consent to sell to Mireles a $39.98 bottle of weed killer for $4.47. A merchant does not consent to the sale of an item where the ostensible purchaser has deceived the merchant as to what is the subject of the transaction.

Moreover, in *Williams*, *supra*, 57 Cal.4th 776, the lawful owner of the property consented to the transaction because it relied on defendant's false representations as to his legitimate capacity to pay; in contrast with the instant case, there was no misrepresentation as to what exchange was being transacted: the store voluntarily sold gift cards to the defendant. As our Supreme Court explained, "Defendant acquired ownership of the gift cards through his false representation, on which Walmart relied, that he was using valid payment cards to purchase the gift cards. Only after discovering the fraud did the store seek to reclaim possession." (*Id.* at p. 788.) Here, Home Depot, in contrast to Walmart, did not rely on a false representation by Mireles at any point in the transaction. In the absence of either any consent by Home Depot to Mireles taking the weed killer from the store for only $4.47 or any reliance by Home Deport (or its agents) on any representation or pretense of Mireles, there could not have been a theft by false pretenses. The larceny began when Mireles removed the weed killer from the shelf and it continued until the time he was arrested. (See § 211; *Davis*, *supra*, 19 Cal.4th at p. 305; *Williams*, at

11

p. 787; *People v. Cooper* (1991) 53 Cal.3d 1158, 1165.)
Accordingly, Mireles was properly charged with second
degree robbery and, as discussed below, properly tried.

## II. The trial court did not abuse its discretion

Mireles contends that the trial court erred with regard
to three rulings. First, he argues that the court improperly
excluded evidence of Bott's prior felony convictions. Second,
Mireles maintains that the trial court should have excluded
evidence of his past criminal conduct. Third, he insists that
the trial court erred in failing to sanction the People for
purportedly failing to disclose timely one of its rebuttal
witnesses, Roth.

We review each of these rulings for an abuse of
discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10
[evidentiary rulings]; *People v. Ayala* (2000) 23 Cal.4th 225,
299 [decision to instruct on discovery abuse].) Under the
abuse of discretion standard, we give "abundant deference to
the trial court's rulings." (*People v. Jackson* (2005) 128
Cal.App.4th 1009, 1018.) A trial court's exercise of
discretion will not be disturbed on appeal unless the court
"exercised it in an arbitrary, capricious, or patently absurd
manner resulting in a manifest miscarriage of justice."
(*Baltayan v. Estate of Getemyan* (2001) 90 Cal.App.4th 1427,
1434.) "It is often said that a trial court's exercise of
discretion will be reversed only if its decision is 'beyond the
bounds of reason.' " (*Horsford v. Board of Trustees of
California State University* (2005) 132 Cal.App.4th 359, 393.)

12

A.     EXCLUSION OF BOTT'S PRIOR CONVICTIONS WAS PROPER

Before the first witness testified, at an Evidence Code section 402 hearing, the People brought to the trial court's attention that one of its witness, Bott, had previously suffered a number of convictions that arguably involved moral turpitude:  a 1983 conviction for selling and/or transporting controlled substances (Health & Saf. Code, § 11352); and two misdemeanor convictions in 1992 for "hit and run" and "petty theft."[3]  The People moved to exclude evidence of Bott's convictions on the ground that they were "too remote in time" to be used by the defense for impeachment purposes.  Over defense counsel's objection, the trial court agreed with the People, noting that the oldest conviction occurred 33 years before trial and the two 1992 convictions occurred 24 years earlier.

Although "[t]here is no consensus among courts as to how remote a conviction must be before it is too remote. [Citation.] . . . [A] conviction that is twenty years old . . . certainly meets any reasonable threshold test of remoteness."  (*People v. Burns* (1987) 189 Cal.App.3d 734, 738.)  Here, each of the convictions at issue was more than

_____

[3] The People also noted that in 2001 Bott was convicted for obstruction of justice and resisting arrest (§ 148, subd. (a)(1)).  During trial, counsel for Mireles argued that that particular conviction was not a crime of moral turpitude.  Consequently, Mireles has waived his argument on appeal with respect to that conviction.

20 years old. Moreover, there was no conviction for a crime of moral turpitude during the intervening 24 years between the date of the most recent convictions and Mireles's trial. (See *People v. Beagle* (1972) 6 Cal.3d 441, 453 [a conviction from " 'long before' " should generally be excluded on the ground of remoteness if followed by a legally blameless life]; cf. *Burns*, at pp. 738–739 [remoteness of a conviction "loses most of its impact" if the witness has served a lengthy prison sentence and has spent limited time out of prison].) Accordingly, we hold that the trial court did not abuse its discretion in excluding Bott's convictions.

B.    ADMISSION OF MIRELES'S PRIOR CONVICTIONS WAS PROPER

Mireles argues that the trial court abused its discretion when it refused to prevent the People from impeaching him with evidence of two thefts he committed in 2010 and 2012— respectively, five and three years before the instant offense.

At trial, before Mireles testified, defense counsel objected to the admission of her client's prior convictions, arguing that they were too remote in time. The trial court overruled the objection. In order to lessen the impact of these convictions on the jury, Mireles admitted to them on direct examination. On appeal, Mireles contends that his prior crimes were "barely probative and it gave the jury almost no additional information regarding [his] moral turpitude."

Our Supreme Court has stated that "[i]n considering whether to admit evidence of a prior felony conviction of a

14

witness subject to impeachment concerning his or her credibility, the prominent factors in determining the probative value of the prior conviction include 'whether the conviction (1) reflects on honesty and (2) is near in time.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 52.) Theft "reflects dishonesty and is a crime involving moral turpitude." (*People v. Wheeler* (1992) 4 Cal.4th 284, 289.) Convictions for crimes similar to the charged offense occurring just three and five years before trial are neither remote in time (*People v. Burns*, *supra*, 189 Cal.App.3d at p. 738) nor unduly prejudicial. (See *People v. Carter* (2014) 227 Cal.App.4th 322, 330 [admission of 11-year-old misdemeanor burglary and theft convictions "not unreasonable and within [trial court's] discretion"].) Accordingly, we hold that the trial court did not err in ruling that the Mireles's prior convictions were admissible.

    C.    THE FINDING OF NO DISCOVERY ABUSE WAS PROPER

During the defense's presentation of evidence, the People advised the trial court and Mireles's counsel that it intended to call two rebuttal witnesses, one of whom was Roth, the Home Depot employee who served as Reyes's approach witness as she followed and then confronted Mireles. Defense counsel objected to Roth on the ground of "unfair surprise"—Roth's name was not on the People's witness list and the defense had not had an opportunity to interview Roth before trial. The trial court overruled the defense's objection for two principal reasons: First, Roth's name was "available, both sides could have contacted him

[before trial]."[4]  Second, there was no late discovery or "sandbagging" by the People, because the People only interviewed Roth the day before and immediately provided to the defense written notes of that interview.  On appeal, Mireles argues that the trial court's ruling was in error because the People violated section 1054.1.

Section 1054.1 requires, among other things, that the prosecuting attorney provide the defense with the "names and addresses of persons [he or she] intends to call as witnesses at trial." (§ 1054.1, subd. (a).)  Although section 1054.1 does not expressly specify that rebuttal witnesses are included, our Supreme Court has held that "the only reasonable interpretation" of the statute is that it "includes both witnesses in the prosecution's case-in-chief and rebuttal witnesses that the prosecution intends to call." (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 375.)  "Absent good cause, such evidence must be disclosed at least 30 days before trial, *or immediately if discovered or obtained within 30 days of trial.*" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133, italics added.)

Here, the People interviewed Roth during trial and "immediately" provided the interview notes to the defense. There is no evidence of sandbagging by the People—that is, there is no evidence that the People intended to call Roth as a witness prior to interviewing him.  Indeed, there is

---

[4] Reyes mentioned Roth by name during her testimony at the preliminary hearing.

evidence that the People were fully prepared to go to trial without ever calling Roth. On June 10, 2016, more than a month before the People interviewed Roth, and after a jury had been selected, Mireles moved successfully for a mistrial due to the defense's difficulty in locating one of its witnesses. The People "strongly opposed" Mireles's motion for a mistrial, advising the trial court that the People "are ready to proceed today. We have our witnesses lined up."

Moreover, as courts have observed, "A trial is not a scripted proceeding. . . . [D]uring the trial process, things change and *the best laid strategies and expectations may quickly become inappropriate*: witnesses who have been interviewed vacillate or change their statements; *events that did not loom large prospectively may become a focal point in reality*. Thus, there must be some flexibility. After all, the ' "true purpose of a criminal trial" ' is ' "the ascertainment of the facts." ' [Citation.] *After hearing a witness, the necessity of a rebuttal witness may become more important*." (*People v. Hammond* (1994) 22 Cal.App.4th 1611, 1624, italic added.) The record below indicates that the state initially did not believe Roth was necessary for its prosecution of Mireles, then, as the trial unfolded, changed its mind about Roth, interviewed him, and immediately thereafter provided the interview notes to the defense. Such conduct did not violate either the letter or the spirit of section 1054.1.

Moreover, even assuming that the trial court did err with respect to Roth, it is not reasonably probable that Mireles would have obtained a more favorable result.

17

(*People v. Watson, supra,* 46 Cal.2d at p. 836.)  First, Mireles admitted on the stand that he had stolen the weed killer. Second multiple witnesses testified that Mireles used force or fear in an attempt to carry off the weed killer.  Reyes testified that when she confronted Mireles he became aggressive with her, "cursing" at her and then swinging a closed fist at her.  Bott testified that he saw Mireles take a "full swing" at Reyes, which prompted him to intervene.[5] Even Mireles's own witness, Brandon Washington, told the police that he saw Mireles pull away from Reyes and put his hands on her.  In short, apart from Roth's testimony, there was strong evidence of Mireles's guilt beyond a reasonable doubt of robbery.

###### D.    NO CUMULATIVE EFFECT

Mireles further contends that the cumulative effect of the alleged errors deprived him of his federal due process right to a fair trial.

"Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have found no errors.

---

[5] Roth testified that Mireles swung at Reyes twice.

18

## DISPOSITION

The judgment is affirmed

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


I concur:


ROTHSCHILD, P. J.

CHANEY, J., Concurring and Dissenting.

I agree that the trial court did not abuse its discretion by excluding evidence of Dennis Bott's prior convictions, admitting evidence of Mireles's prior convictions, or allowing Clifton Roth to testify as a rebuttal witness. Because I concur that the court did not abuse its discretion in those matters, I also concur that those alleged errors did not have the cumulative effect of depriving Mireles of due process.

Nevertheless, I believe *People v. Williams* (2013) 57 Cal.4th 776 (*Williams*) controls the outcome here, and I would reverse. Therefore, I respectfully dissent.

The majority opinion relies on *People v. Davis* (1998) 19 Cal.4th 301 (*Davis*) and attempts to distinguish *Williams* to find that the basis of Mireles's crime was larceny rather than theft by false pretenses and that, therefore, his conviction for robbery is supported by *People v. Estes* (1983) 147 Cal.App.3d 23.

*Davis* was not a robbery case. Our Supreme Court did not decide whether Davis could have been convicted of robbery for his larceny of a shirt had a scuffle ensued when he attempted to leave Mervyn's with a fraudulently obtained credit voucher (instead of a shirt). Consequently, without more *Davis* would theoretically support a jury's finding that Mireles's initial taking of the weed killer from the shelf was a larceny. But *Davis* cannot support any more than that proposition. The majority opinion extends *Davis* far beyond its natural or logical reach.

On the other hand, the majority opinion attempts to distinguish *Williams*. The majority opinion characterizes *Williams* thus: "[T]he defendant Williams used a credit card that had been 're-encoded with a third party's credit card information' to purchase a gift card from a novice Walmart cashier, who did not know that such purchases were against company policy—Walmart prohibited the use of credit cards for purchases of gift cards. [Citation.] After Walmart 'permitted' the defendant to keep the first gift card, *he tried to purchase more gift cards at a different register; as a result, he came under the scrutiny of the store's loss prevention personnel.* [Citation.] Security guards eventually confronted the defendant; they pointed out to him that the number on his credit card did not match the credit card number on the sales receipt. When the guards attempted to detain the defendant, he pushed past them and ran." (Maj. opn. *ante*, at p.8, italics added.)

Williams did not merely *try* to purchase more gift cards at a different register; he actually *did* purchase at least one more gift card at a different register. And Walmart (a) *suspected Williams of engaging in fraudulent transactions*, and (b) *watched him do so*, before (c) confronting and eventually detaining him. Walmart's loss prevention officer "directly observed defendant purchase a [second] Walmart gift card" at a different register. (*Williams*, *supra*, 57 Cal.4th at p. 792 (dis opn. of Baxter, J.).) The majority opinion allows the reader to infer that Walmart's loss prevention officers did not know about the fraudulent nature

2

of the transactions, and therefore Walmart "consented" to the transactions.

Many of the critical facts here are strikingly similar. *Those* facts have been omitted from the majority opinion's comparison of this case to *Williams*. Specifically, Reyes recognized that the bottle of weed killer at issue was a high theft item and she followed Mireles to the self-checkout station because she was concerned about the possibility of theft. Along the way, she asked another employee, Roth, to act as an approach witness if Mireles *did* engage in ticket switching. Both Roth and Reyes watched Mireles put the different UPC sticker on the bottle of weed killer at the self-checkout station. As soon as Reyes confirmed from the main pay station that Mireles had paid only a fraction of the true price for the weed killer, she moved immediately, pursuant to company policy, to intercept Mireles, which she did before he had even reached the parking lot.

These facts make this case virtually indistinguishable from *Williams*. The majority opinion posits that "Home Depot, in contrast to Walmart, did not rely on a false representation by Mireles at any point in the transaction." (Maj. opn. *ante*, at p.11.) If that is true, then it must also be true that Walmart did not rely on Williams when he purchased a second gift card using re-encoded credit cards because a Walmart security guard who suspected fraudulent activity stationed himself on a bench across from the second register to watch Williams conduct the fraudulent transaction.

3

We are not without guidance about what constitutes theft by false pretenses.  *People v. Traster* (2003) 111 Cal.App.4th 1377 (*Traster*) explained that there is a type of larceny—larceny by trick—similar to theft by false pretenses.  "Because these crimes share so many similar characteristics, '[t]he distinction between larceny and false pretenses sometimes depends on a close analysis of facts and legal principles.'  If 'title still remains in the owner, larceny is established:  while the crime is false pretenses, if the title, as well as the possession, is absolutely parted with.'  *Stated differently, if the defendant obtains possession of property for a specific or special purpose, the owner does not relinquish title and the crime committed is larceny by trick.  On the other hand, it is theft by false pretenses if the owner of the property gives the property to the defendant or another he controls intending the defendant or this other entity to become the unconditional and unrestricted owner.*  [¶]  A noted treatise writer explains the difference between the two crimes when the property at issue . . . is cash . . . .  It is generally held that where the victim hands money to the wrongdoer with the understanding that the latter is to spend it only for a particular purpose (thus creating an agency or trust, it would seem) title does not pass to the wrongdoer; he has only a power to pass title by spending it for the specified purpose.  Thus where the victim hands money to the wrongdoer to be invested on the stock marke[t], or to purchase specified property, or to bribe a particular official, and the wrongdoer, instead of thus dealing with the money,

absconds with it, the crime is larceny by trick rather than false pretenses, the wrongdoer never having acquired title." (*Traster, supra*, 111 Cal.App.4th at pp. 1387-1388, fns. omitted, italics added.)

The majority opinion may, therefore, lead to inconsistent charging and punishment of the same type of crime. Beyond its omission of critical facts, it offers no clear measure of the difference between what happened in *Williams* and what happened here.

In summary, the majority opinion finds that Mireles committed larceny when he first picked up the bottle of weed killer from the shelf and that larceny became robbery in the parking lot when a scuffle ensued between Mireles and Reyes: "The larceny began when Mireles removed the weed killer from the shelf and it continued until the time he was arrested." (Maj. opn., *ante*, at p. 11.) There was, however, *a transaction between those two events* that the majority opinion does not acknowledge. As in *Williams*, *that* transaction defined the crime. Mireles did not simply pick up the bottle and walk out of the store without paying for it, just as Williams did not simply pick up gift cards and walk out of the store without paying for them. In each case, the defendant *pretended* to pay for the product before absconding.

I see no meaningful distinction between *Williams* and this case. And that the *Williams* court was aware of (and cited to) *Davis* leads me further to conclude that *Williams*

5

knowingly created the distinction the majority opinion now seeks to ignore.

 *Williams* is the law and it directs a different outcome here.  I therefore dissent.


  CHANEY, J.