CHANEY, J., Concurring and Dissenting.
I agree that the trial court did not abuse its discretion by excluding evidence of Dennis Bott's prior convictions, admitting evidence of Mireles's prior convictions, or allowing Clifton Roth to testify as a rebuttal witness. Because I concur that the court did not *250 abuse its discretion in those matters, I also concur that those alleged errors did not have the cumulative effect of depriving Mireles of due process.
Nevertheless, I believe People v. Williams (2013) 57 Cal.4th 776, 161 Cal.Rptr.3d 81, 305 P.3d 1241 ( Williams ) controls the outcome here, and I would reverse. Therefore, I respectfully dissent.
*914 The majority opinion relies on People v. Davis (1998) 19 Cal.4th 301, 79 Cal.Rptr.2d 295, 965 P.2d 1165 ( Davis ) and attempts to distinguish Williams to find that the basis of Mireles's crime was larceny rather than theft by false pretenses and that, therefore, his conviction for robbery is supported by People v. Estes (1983) 147 Cal.App.3d 23, 194 Cal.Rptr. 909.
Davis was not a robbery case. Our Supreme Court did not decide whether Davis could have been convicted of robbery for his larceny of a shirt had a scuffle ensued when he attempted to leave Mervyn's with a fraudulently obtained credit voucher (instead of a shirt). Consequently, without more Davis would theoretically support a jury's finding that Mireles's initial taking of the weed killer from the shelf was a larceny. But Davis cannot support any more than that proposition. The majority opinion extends Davis far beyond its natural or logical reach.
On the other hand, the majority opinion attempts to distinguish Williams . The majority opinion characterizes Williams thus: "[T]he defendant Williams used a credit card that had been 're-encoded with a third party's credit card information' to purchase a gift card from a novice Walmart cashier, who did not know that such purchases were against company policy-Walmart prohibited the use of credit cards for purchases of gift cards. [Citation.] After Walmart 'permitted' the defendant to keep the first gift card, he tried to purchase more gift cards at a different register; as a result, he came under the scrutiny of the store's loss prevention personnel . [Citation.] Security guards eventually confronted the defendant; they pointed out to him that the number on his credit card did not match the credit card number on the sales receipt. When the guards attempted to detain the defendant, he pushed past them and ran." (Maj. opn. ante , at p. 909, italics added.)
Williams did not merely try to purchase more gift cards at a different register; he actually did purchase at least one more gift card at a different register. And Walmart (a) suspected Williams of engaging in fraudulent transactions , and (b) watched him do so , before (c) confronting and eventually detaining him. Walmart's loss prevention officer "directly observed defendant purchase a [second] Walmart gift card" at a different register. ( Williams , supra , 57 Cal.4th at p. 792, 161 Cal.Rptr.3d 81, 305 P.3d 1241 (dis opn. of Baxter, J.).) The majority opinion allows the reader to infer that Walmart's loss prevention officers did *251 not know about the fraudulent nature of the transactions, and therefore Walmart "consented" to the transactions.
Many of the critical facts here are strikingly similar. Those facts have been omitted from the majority opinion's comparison of this case to Williams . Specifically, Reyes recognized that the bottle of weed killer at issue was a high theft item and she followed Mireles to the self-checkout station because she was concerned about the possibility of theft. Along the way, she asked another employee, Roth, to act as an approach witness if Mireles did engage in ticket switching. Both Roth and Reyes watched Mireles put the different UPC sticker on the bottle of weed killer at the self-checkout station. As soon as Reyes confirmed from the main pay station that Mireles had paid only a fraction of the true price for the weed killer, she moved immediately, pursuant to company policy, to intercept Mireles, which she did before he had even reached the parking lot.
These facts make this case virtually indistinguishable from Williams . The majority opinion posits that "Home Depot, in contrast to Walmart, did not rely on a false representation by Mireles at any point in the transaction." (Maj. opn.
*915 ante , at p. 910.) If that is true, then it must also be true that Walmart did not rely on Williams when he purchased a second gift card using re-encoded credit cards because a Walmart security guard who suspected fraudulent activity stationed himself on a bench across from the second register to watch Williams conduct the fraudulent transaction.
We are not without guidance about what constitutes theft by false pretenses. People v. Traster (2003) 111 Cal.App.4th 1377, 4 Cal.Rptr.3d 680 ( Traster ) explained that there is a type of larceny-larceny by trick-similar to theft by false pretenses. "Because these crimes share so many similar characteristics, '[t]he distinction between larceny and false pretenses sometimes depends on a close analysis of facts and legal principles.' If 'title still remains in the owner, larceny is established: while the crime is false pretenses, if the title, as well as the possession, is absolutely parted with.' Stated differently, if the defendant obtains possession of property for a specific or special purpose, the owner does not relinquish title and the crime committed is larceny by trick. On the other hand, it is theft by false pretenses if the owner of the property gives the property to the defendant or another he controls intending the defendant or this other entity to become the unconditional and unrestricted owner. [¶] A noted treatise writer explains the difference between the two crimes when the property at issue ... is cash.... It is generally held that where the victim hands money to the wrongdoer with the understanding that the latter is to spend it only for a particular purpose (thus creating an agency or trust, it would seem) title does not pass to the wrongdoer; he has only a power to pass title by spending it for the specified purpose. Thus where the victim *252 hands money to the wrongdoer to be invested on the stock marke[t], or to purchase specified property, or to bribe a particular official, and the wrongdoer, instead of thus dealing with the money, absconds with it, the crime is larceny by trick rather than false pretenses, the wrongdoer never having acquired title." ( Traster , supra , 111 Cal.App.4th at pp. 1387-1388, 4 Cal.Rptr.3d 680, fns. omitted, italics added.)
The majority opinion may, therefore, lead to inconsistent charging and punishment of the same type of crime. Beyond its omission of critical facts, it offers no clear measure of the difference between what happened in Williams and what happened here.
In summary, the majority opinion finds that Mireles committed larceny when he first picked up the bottle of weed killer from the shelf and that larceny became robbery in the parking lot when a scuffle ensued between Mireles and Reyes: "The larceny began when Mireles removed the weed killer from the shelf and it continued until the time he was arrested." (Maj. opn., ante , at p. 910.) There was, however, a transaction between those two events that the majority opinion does not acknowledge. As in Williams , that transaction defined the crime. Mireles did not simply pick up the bottle and walk out of the store without paying for it, just as Williams did not simply pick up gift cards and walk out of the store without paying for them. In each case, the defendant pretended to pay for the product before absconding.
I see no meaningful distinction between Williams and this case. And that the Williams court was aware of (and cited to) Davis leads me further to conclude that Williams knowingly created the distinction the majority opinion now seeks to ignore.
Williams is the law and it directs a different outcome here. I therefore dissent.